**ATLAS LIFE INS. CO. v. NATIONAL LABOR RELATIONS BOARD et al.**

No. 4307.

United States Court of Appeals
Tenth Circuit.

Feb. 28, 1952.

Harry D. Moreland, Tulsa, Okl., (Theodore Rinehart and Jack E. Campbell, Tulsa, Okl., on the brief), for petitioner.

Fannie M. Boyls, Washington, D. C. (George J. Bott, David P. Findling, A. Norman Somers, all of Washington, D. C., and Walter F. Hoffman, Washington, D. C., on the brief), for respondents.

Before PHILLIPS, Chief Judge, and BRATTON and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

This proceeding is before the court upon the petition of Atlas Life Insurance Company, hereinafter called the company, to review and set aside an order of the National Labor Relations Board which found the company guilty of unfair labor practices as defined and prohibited by Sec. 8 (a)(5) and (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a)(1, 5). The company was charged with refusing to bargain with the union and of unlawfully interrogating company employees concerning their union membership. The order directed the company to cease and · desist from such practices.

The evidence before the Board was undisputed. The union, Local 948, International Union of Operating Engineers, hereinafter called the union, had four members who were working as building engineers in a building owned by the company in Tulsa, Oklahoma. In 1949, in a representative proceeding, the union lost the election.[1] By June 1, 1950, all four of the company's engineers had designated the union to act for them for the purpose of collective bargaining in written applications for membership in the union, but this was not known to the company. On June 15, 1950, C. C. Callicoat, appearing in the proceedings as business representative of the union, approached the president of the company, Johnson D. Hill, and asked him to agree that Callicoat be the bargaining agent for the company's engineering em-

---

1. This election was held pursuant to Section 9(c) of the Act, 29 U.S.C.A. § 159 (c). The union filed a second petition for representation before the Board on April 17, 1950, but voluntarily withdrew the petition before the Board could act upon it.

ployees. Callicoat had no credentials showing that he had been designated by the union as its representative, and he did not represent that such authority was in existence. There were no existing disputes of any kind between the company and any of its employees. Callicoat requested Hill to execute an instrument designating Callicoat as the bargaining representative of the union. It had not been signed by the union. Hill did not sign the instrument. Callicoat made no request that the company enter into any kind of bargaining negotiations.

Immediately after Callicoat's call, Hill made inquiry and found that the four engineers were union members. He then wrote the union advising it of Callicoat's visit, stating that there were no disputes and that because of the small number of mem-

ers, he saw no need for the current appointment of a representative.[2] Hill heard nothing further concerning Callicoat's request until he was notified by the National Labor Relations Board that his company had been charged with unfair labor practices. Upon receiving notice of the charge, Hill wrote to the Board stating his lack of knowledge of the charge; that there were no existing disputes between the company and the union; and that after Callicoat's visit he had made inquiry and learned that all the engineers were then members of the union and were being paid the union scale. He again expressed his belief that the union was too small to do more than was being done.[3]

Thereafter, on December 14, 1950, the General Counsel filed a complaint based on the charge alleging that the company was

2.  The letter dated June 16, 1950 reads:
    "On yesterday Mr. C. C. Callicoat called on me and requested my Company to sign an agreement under the terms of which he would be a bargaining representative for our building engineers.
    "Since his visit I have checked the situation with our building engineers and find that they are all members of your union. All of the craft work in the Atlas Building is done by union representatives, including the painters and carpenters, so as far as I can find out the unions have everything there is to have in our operations.
    "We have no problems on any score, and therefore no need for a representative. We only have four engineers whom we see personally every day, and it would be rather fantastic to have an intermediary represent us in any possible conversation with these few men whom we know better than an intermediary would ever know. We anticipate no difficulties of any kind, unless they are artificially created by entirely extraneous activity.
    "Since both the union members and the Company seem to be getting along fine, we have no current occasion to appoint anyone for the purpose of settling difficulties which do not exist."

3.  This letter dated October 5, 1950, reads:
    "I have your letter of yesterday concerning a charge you say was filed by Mr. C. C. Callicoat and which I did not know existed. I had what I thought was a very pleasant visit with Mr. Callicoat, and supposed he had gone back to finish his medical education by this time.

    "We employ union men belonging to unions other than the Engineer's union, and I think have always been considered a good friend to the union movement. Our organization, along all lines, is too small from any standpoint to either require or justify more than we have been doing. I do not have before me a copy of my letter to which you refer, but it is my recollection that after Mr. Callicoat's visit I inquired of our engineers whether or not they were members of the Union and they told me that they were. I also made inquiries as to the union scale of pay and saw to it that we were paying this scale. Since there did not seem to be any occasion for argument about any subject I wrote the letter which apparently you have.

    "As stated above, we have always been considered a friend of Labor, and I have personally done some good turns for the organization as a whole, particularly when as a member of the Legislature I took care of nuisance legislation.

    "It is my personal feeling that there is still no occasion for any argument, and if there is going to be one I should withdraw from the picture and refer the whole matter to our Legal Department. I think that unless and until there is some complaint from some of our employees there is really nothing to talk about and trust you will agree with me. I am not advised as to the jurisdictional questions involved, but do not intend that any statement of mine should have any bearing on such questions one way or another."

guilty of unfair labor practices in that it refused to bargain collectively with the union, and that it had interrogated union members concerning their union affiliations and had threatened and warned its employees against becoming members or remaining members of the union. The company denied these allegations.

⦾ ■ Assuming that the record is sufficient to show that the union was the appropriate organization and designated to represent the employees, we find after a consideration of the record as a whole that there is no substantial evidence to sustain the order. To sustain the charge in the complaint, the Board relied upon the two letters written by Hill. Although appearing in the proceeding, Callicoat did not give his version of what was said at his meetings with Hill. He did not deny Hill's testimony. Hill testified that the question of bargaining was never mentioned in the Callicoat meetings; and that the only request made of him by Callicoat was that he be recognized as the representative of the union for bargaining purposes. He testified that he had never refused to bargain, but if there was to be bargaining that he saw no need for a go-between or a representative of the union when there were so few members and he saw them every day. Hill also testified that since he was responsible for the operation of the business, after Callicoat's request he endeavored to determine the reason therefor, and called one of the building engineers to his office and asked him "to bring me up to date about what was going on around the building." Hill was informed that all the building engineers had joined the union. Subsequently, a second building engineer, while in Hill's office, volunteered the information that he did not belong to the union. There was nothing in the conversations with these two employees from which threats or coercion adverse to the union, or even an antiunion attitude, could be inferred, and, in fact, the opposite appears. Hill never urged any of his employees to quit the union and never coerced or intimidated them with respect to their union membership. The record shows that one employee was discharged because he was not a member of the union. This was the only evidence before the Board.

Under Section 8(a)(5) of the National Labor Relations Act, it is an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees who have been designated and selected as required by Section 9(a) of the Act. 29 U.S.C.A. § 159(a).[4]

The obligation to bargain collectively or recognize a union representative exists only after the statutory bargaining representative requests the employer to bargain collectively.[5] The evidence is uncontradicted that Callicoat was not the statutory bargaining representative of the union here, but was seeking to establish himself as such.

Hill's efforts to determine what the status of the union was in the operation of the business for which he was responsible, and his comments to one of the building engineers that it was a small setup and that there was not much chance for argument because they were together and saw each other all the time, did not constitute an interference with the rights of the employees to organize within the meaning of the statute.[6]

The evidence does not meet the requirements to sustain the findings of the Board and its order should be set aside.[7]

4. May Dept. Stores Co. v. N. L. R. B., 326 U.S. 376, 383, 66 S.Ct. 203, 90 L.Ed. 145; Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 683, 64 S.Ct. 830, 88 L.Ed. 1007.

5. N. L. R. B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660; N. L. R. B. v. West Kentucky Coal Co., 6 Cir., 152 F.2d 198, 200, certiorari denied 328 U.S. 866, 66 S.Ct. 1372, 90 L.Ed. 1636.

6. Section 8(a) (1) of the Act provides: "(a) It shall be an unfair labor practice for an employer— "(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 of this title"; 29 U.S.C.A. Sec. 158(a) (1).

7. N. L. R. B. v. Pittsburgh Steamship Co., 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479; Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.