**NATIONAL LABOR RELATIONS BOARD**
v.
**SOUTHEASTERN RUBBER MFG. CO., Inc.**

No. 14851.

United States Court of Appeals, Fifth Circuit.

May 20, 1954.

Rehearing Denied June 4, 1954.

A. Norman Somers, Asst. Gen. Counsel, NLRB, David P. Findling, Assoc. Gen. Counsel, NLRB, Washington, D. C., William M. Pate, Chief Law Officer, NLRB, Atlanta, Ga., George J. Bott, Gen. Counsel, Owsley Vose, Alice Andrews, Washington, D. C., Attys. for petitioner.

John Wesley Weekes, Decatur, Ga., Abit Nix, Athens, Ga., for respondent.

Before STRUM and RIVES, Circuit Judges, and DAWKINS, District Judge.

RIVES, Circuit Judge.

The Board petitions for enforcement of its order issued against respondent on August 26, 1953, its decision and order being reported at 106 N.L.R.B. 157.

Respondent is a Georgia corporation, engaged in the processing of rubber and rubber products at Athens, Georgia, where it employs approximately 19 workers. In early May, 1952, its employees met with a representative of the United Rubber, Cork, Linoleum and Plastic Workers of America, C.I.O., and on May 7, 1952, ten of the employees signed union membership cards. Only 15 employees were in the appropriate unit for

bargaining purposes at that time.[1] The Union wrote a letter to respondent on May 12, serving notice that it had become the majority representative of the plant employees, and further stating:

"It is the desire of the Union to institute negotiations with you in respect to rates of pay, wages, hours of employment and other conditions of employment. To this end we request that you indicate to us whether you will recognize the Union as such exclusive representative, and negotiate accordingly.

\* \* \* \* \* \*

"You are advised that in the event you fail or refuse to comply with our request, we propose to file a petition with the National Labor Relations Board asking certification of our Union as the exclusive bargaining agent for such employees."

Respondent did not reply to the above letter. Two subsequent phone calls from the Union representative, Steinke, to respondent's vice-president and plant manager, Ralph Snow, for the purpose of opening bargaining negotiations proved fruitless, the representative being told on both occasions that Snow was not available. As a result of respondent's refusal to recognize the Union a petition for certification was filed with the Board, and on June 11 a consent election agreement was entered into between the Union and respondent. The election was held on June 26, and resulted in the defeat of the Union by a vote of 13 to 6.[2]

After the Union filed its petition for certification and an election, respondent engaged in certain conduct which the Trial Examiner and a majority of the

Board found was calculated to intimidate and restrain its employees from freely expressing their union preference, and to dissipate the Union's majority in the election. During this period Vice-President Snow, who frankly admitted being opposed to having a union in the plant, personally interviewed in his office all of the workers who had previously signed union membership cards, and informed them that he "didn't like unions" and "asked them how they felt". As a result of Snow's interrogation, at least two employees, Arnold Bryson and Knox Coile, repudiated the union, though they had previously signed union membership cards during the organizational period. According to Snow's own testimony, Bryson told him "that he did not sign a card, and would not", and Bryson conceded at his interview that he agreed to "vote for the company" in the election. Coile admitted in his testimony that, after he had signed a union membership card and "about two or three weeks before the election", he told Snow he "didn't agree with the union". Snow stated upon interviewing another employee, Pettit, that he "was against the union" and intimated his surprise at Pettit's affiliation with it; that "some of the fellows had changed" and Pettit should "think the thing over". The testimony further reveals that a number of other employees were similarly questioned by Snow regarding their union affiliation and sympathy.[3]

Respondent's plant superintendent, Grady Oaks, also questioned the employees as to how they intended voting in the election, and attempted to induce an employee to renounce the union by

1. The Trial Examiner found that all production and maintenance employees of Respondent, excluding office clerical employees, guards, professional employees and supervisors as defined in the Act, constituted a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act, 29 U.S.C.A. § 159(b). He actually excluded from the bargaining unit 2 of these 15 employees, because of their supervisory status, though the Board did

not review this finding since their inclusion did not materially affect the union's majority on May 7th.

2. The increase in the number of respondent's employees voting in the election apparently resulted, at least in part, from respondent's hiring of several new workers during the month preceding the election.

3. Among this group were union members Russell, Moore, Hill, Parker and Wilson.

threats that "working hours would be cut shorter" if the union prevailed, but that "hours and pay would be increased * * * if the union did not come in." The particular employee summoned by Oaks for interrogation, Albert Wilson, conceded in his testimony that he was "for the company" and "against the union, in order to keep my job", and that he complied with Oaks' request that he "talk with (Arnold) Bryson, get him to string along with the company." This last mentioned employee, about whose preference Superintendent Oaks was in some doubt, was sent for and questioned in the presence of Oaks and Snow shortly before the election as to his voting intentions, at which time Oaks expressed satisfaction at Bryson's statement that he "would go for the company", and added that Bryson "would see flowers blooming in his hat" if he voted against the union. Two other employees, Moore and Hitchcock, also testified that they were called into Superintendent Oaks' office and questioned regarding their union affiliation and voting intentions in a manner similar to that used in interrogating Wilson and Bryson. All of the employees who were personally interviewed and questioned either by Snow or Oaks, or both, regarding their union affiliation and voting intentions between the date of the union's petition for an election and the date the election was held, actually voted in the Board conducted election on June 26th, by which time the union's majority had been effectively dissipated in the manner hereinabove set forth, and the union was defeated.

Relying mainly on the above testimony, a majority of the Board found that the union was the bargaining representative of respondent's employees on May 12th,[4] and that it made a clear and unequivocal request in its letter to respondent on that date to recognize and bargain with it. In so holding, it reversed the Trial Examiner's contrary interpretation of the union's May 12th letter as containing an equivocal request to bargain because it conferred upon respondent "the option of recognizing the Union on the basis of its card designations or on the basis of certification by the Board." In this connection, the Board adopted the view that the fact that a union expresses an intention to file a representation petition with the Board if the employer does not grant recognition voluntarily does not justify a refusal to bargain where the evidence reveals that the employer had deliberately engaged in unfair labor practices in order to dissipate the union's majority and make the holding of a fair election impossible. Both the Trial Examiner and the Board found that from May 12th, the date of the union's letter, until the date of the election on June 26th, respondent, through Vice-President Snow and Superintendent Oaks, engaged in coercive conduct violative of Section 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1), through interrogation and intimidation of the employees because of their union membership, though no independent violations of the Act were predicated on such conduct.[5]

■■ We think the Board properly found that the union's request to bargain, as set forth in its May 12th letter to respondent, was clear and unequivocal, for the Act does not require any particular form of request, but only that the employees signify their desire to negotiate. See N.L.R.B. v. Columbian Enameling &

---

4. Chairman Guy Farmer dissented, on the theory that no Section 8(a) (5), 29 U.S.C.A. § 158(a) (5), refusal to bargain violation was shown because there was no convincing proof "that the Union at any time represented a majority of the employees", and that the alleged Section 8 (a) (1) violations were too "insubstantial" to justify a cease and desist order.

5. In this connection, respondent apparently contends that, since no *independent*

findings of 8(a) (1) violations were made as to the activity of Snow and Oaks, such testimony may not be considered in connection with respondent's refusal to bargain. However, we think the Board was entitled to consider this testimony as "background evidence" in ascertaining respondent's true motivation underlying its refusal to negotiate. Cf. N. L. R. B. v. National Shoes, 2 Cir., 208 F.2d 688, 692.

Stamping Co., 306 U.S. 292, 297, 59 S.Ct. 501, 83 L.Ed. 660. The language here used, viewed in its entirety, fairly meets that test. Joy Silk Mills v. N.L.R.B., 87 U.S.App.D.C. 360, 185 F.2d 732, 741; cf. N.L.R.B. v. Valley Broadcasting Co., 6 Cir., 189 F.2d 582, 586; Atlas Life Ins. Co. v. N.L.R.B., 10 Cir., 195 F.2d 136, 138. It seems to us that the Trial Examiner and respondent, in concluding that the letter conferred an option upon respondent of either recognizing the union or insisting upon Board certification, improperly construe in isolation the last paragraph thereof, and either ignore or fail to accord due significance to the second paragraph plainly revealing the union's desire to negotiate.[6] Once a clear request for bargaining was made,[7] we do not think the concluding statement by the union that it would institute certification proceedings with the Board in the event the request was refused was sufficient to invalidate it or justify respondent in ignoring its effect for bargaining purposes.

■ Furthermore, the facts and circumstances here shown support the Board's inference that respondent's refusal to bargain on and after May 12th was not motivated by a good faith doubt as to the union's majority status, but by anti-union animus and respondent's desire to sway its employees from their union affiliation through intimidation and otherwise coercive tactics. See N.L.R.B. v. Stewart, 5 Cir., 207 F.2d 8, 13; N.L.R.B. v. Syracuse Color Press, Inc., 2 Cir., 209 F.2d 596, 599–600; N.L.R.B. v. Poultry Enterprises, Inc., 5 Cir., 207 F.2d 522, 525; N.L.R.B. v. Lambert, 5 Cir., 211 F.2d 91, 94; N.L.R.B. v. Model Mill Co., 6 Cir., 210 F.2d 829. The union's authority as bargaining representative had then been established by signed union membership cards by a majority of respondent's employees in the appropriate bargaining unit,[8] and its subsequent loss of majority being fairly attributable to respondents' unfair labor practices, the Board, in the exercise of its statutory discretion, was justified in setting the election result aside as not truly representing the untrammeled will of respondent's employees. N.L.R.B. v. Bradford Dyeing Association, 310 U.S. 318, 340, 60 S.Ct. 918, 84 L.Ed. 1226; N.L.R.B. v. Howell Chevrolet Co., 9 Cir., 204 F.2d 79, 86.

■ Under the circumstances shown, we must further reject respondent's contention that the union, having consented to the election, was bound by the result adverse to it, and was estopped from relying upon respondent's coercive pre-election stratagems as a basis for setting the election aside. This Court has recently held that "The statutory requirement of good faith bargaining is not subject to waiver through action or inaction of parties to a labor controversy", for the Board's duty to enforce the public policy underlying the Act transcends private rights and ordinary principles of contract law. See Armstrong Cork Company v. N.L.R.B., 5 Cir., 211 F.2d 843; N.L.R.B. v. Howell Chevrolet Co., supra; Warehousemen's Union, etc., v. N.L.R.B., 74 App.D.C. 28, 121 F.2d 84, 93–94.

6. As heretofore quoted, that portion of the union's letter informed respondent that "It is the desire of the Union to institute negotiations with you in respect to rates of pay, wages, hours of employment", etc. and "To this end we request that you indicate to us whether you will recognize the Union * * *", etc.

7. The fact that it was understood as such by respondent is clearly evidenced by its failure to reply to the union's letter or discuss the matter over the telephone with the union representative, Steinke. Indeed, in its answer to the complaint, respondent admitted that it had been "requested * * * to bargain collectively with the Union", but affirmatively defended on the ground that the union lacked a majority. Under these facts, we think the Board properly rejected this defense, injected into the case ex mero motu by the Trial Examiner, as without substance or merit.

8. See N. L. R. B. v. Kobritz, 1 Cir., 193 F.2d 8, 14; N. L. R. B. v. Parma Water Lifter Co., 9 Cir., 211 F.2d 258; N. L. R. B. v. Trimfit of California, Inc., 9 Cir., 211 F.2d 206, 210.

The findings of the Board that respondent violated Sections 8(a) (5) and (1) of the Act being supported by substantial evidence on the record considered as a whole,[9] the order of the Board is hereby

Enforced.

9. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.