**SKYLINE HOMES, INC.,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 19352.

United States Court of Appeals Fifth Circuit.

Oct. 11, 1963.

Rehearing Denied Nov. 13, 1963.

Larry S. Davidow, Davidow & Davidow, Detroit, Mich., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Dominick L. Manoli, Associate Gen. Counsel, N. L. R. B., Standau E. Weinbrecht, Atty., N. L. R. B., Washington, D. C., Stuart Rothman, Gen. Counsel, Melvin J. Welles, Atty., N. L. R. B., for respondent.

Before TUTTLE, Chief Judge, and JONES and GEWIN, Circuit Judges.

644

JONES, Circuit Judge.

The petition of Skyline Homes, Inc. asks that this Court set aside an order of the National Labor Relations Board directing it to cease and desist from stated practices in violation of Sections 8(a) (1), (3) and (5) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. The Board seeks enforcement of its order. The decision and order of the Board are reported in 134 NLRB 155.

Submitted for our determination are the questions as to whether there is substantial evidence on the record as a whole to support the Board's findings (a) that Skyline Homes laid off eighteen employees in violation of the provisions of Section 8(a) (3) and (1) of the Act; (b) that it interrogated and threatened its employees in violation of Section 8(a) (1) of the Act; and (c) that it refused to bargain in good faith with the United Brotherhood of Carpenters and Joiners in violation of Section 8(a) (5) and (1). We answer the first question in the negative and the second and third in the affirmative.

Some of the facts are undisputed. Skyline Homes is an Indiana corporation with a plant in Ocala, Florida. It manufactures mobile homes, commonly known as trailers. Skyline Homes moved into its present Florida location on May 1, 1960.[1] On May 30 and 31, the plant superintendent, Ralph Kreischer, placed an advertisement for help in the Ocala Star-Banner as follows:

> "Skyline needs help in all departments. Only experienced mobile home builders or carpenters need apply. Apply in person to Ralph Kreischer any time at new industrial park near Taylor Field."

The move to the new plant and changes made in the models of trailers had resulted in complaints from some employees that they were unable to make their piece rates. The placing of the advertisement and the hiring of new employees followed. Between June 1 and June 17, fifteen men were hired, rehired, or recalled to work.

Union activity started in the plant on June 11. By Friday, June 17, seventeen out of petitioner's thirty-three employees had signed union authorization cards. That morning three union representatives called on resident manager James C. Overman. The spokesman of the trio, Warren Conary, told Overman that their union represented a majority of his workers and they wished to negotiate a contract for them. The discussion lasted for an hour and many aspects of unionization were discussed. Among other things Overman asked for and got a lengthy explanation of election proceedings. Overman told the union representatives that he was not authorized to bind the company. He requested that he be furnished with a contract form. This was furnished to him after the conference. It contained the usual terms and clauses. Overman sent the contract form to the company's home office in Indiana. A meeting was arranged between Overman and the union officials for the following Tuesday morning. After the Friday meeting Overman called petitioner's president, Arthur Decio, to inform him of developments. The latter told Overman that he was not an officer or director of the company and could not negotiate with the union.

At the end of that work day Kreischer, the plant superintendent, announced the layoff of sixteen men. The employer did not know which, if any, of those laid off had signed up with the union. It appeared later that eight were union adherents and the other eight were not. The following Monday Kreischer recalled one of the non-signers and laid off two more union men.

On Tuesday, Adlai A. Pittman, an organizer of the union, called Overman to report that Warren P. Conary, who was to negotiate for the union, would not arrive in time for the meeting scheduled for ten o'clock that morning and to request that it be postponed until one or

---

1. All dates referred to hereafter are in 1960.

two o'clock that afternoon. Overman replied that it would not be worth their while to come since he had been informed that he had no authority to deal with them. That was the last conversation between the union and the company. On Thursday, June 23, the union filed unfair labor practice charges with the Board.

On the same day, June 23, Overman again talked to Skyline Homes' president about the union. Decio told Overman that counsel for the company, Larry S. Davidow, would be in touch with him and would be down the next day to discuss, or negotiate with, the union. He arrived early in the morning on Friday, June 24. Overman met his plane and on their way into Ocala stopped to pick up his mail. In it was a registered letter from the Board notifying the petitioner of the charges filed against it by the union. Mr. Davidow concluded that it would be no use trying to deal with the union while the charges were pending.

The Board found, overruling the Trial Examiner, that the layoffs of June 17 and 20 constituted a violation of Section 8(a)(3). We shall discuss the two layoffs separately and in order. To sustain its determination of discriminatory motivation, the Board relies on the finding that before the layoff on June 17 (1) Overman questioned almost all of the employees, either individually or in groups, about the union, and (2) that someone in the company's home office talked to Kreischer to ascertain whether Kreischer knew who "the instigators" were.

In regard to the first finding, it appears that the Board was mistaken in its reading of the record. It is not shown that Overman questioned any employee prior to the first layoff on Friday afternoon. The Trial Examiner did not so find.

As to the second finding the Trial Examiner accepted the testimony of employee Dodd that he overheard Kreischer, in a conversation with someone at the Indiana headquarters spiced with "yes sirs" and "no sirs," say, "Yes,

sir, we know approximately how many" and "Yes, we definitely know who the instigators is [sic]." Kreischer testified that he did not recall having a conversation with the company headquarters that day and flatly denied ever having made the remarks Dodd attributed to him. However, the Trial Examiner credited Dodd's testimony and we accept his finding. N. L. R. B. v. Walton Mfg. Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829. Nevertheless, the Trial Examiner did not think that this constituted sufficient evidence of a discriminatory motive to warrant a finding of a Section 8(a)(3) violation. We agree. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. As to the first layoff, there was no other evidence of discrimination. The Examiner found, and the Board accepted his finding, that there was no evidence that the petitioner had any knowledge of union activity in the plant prior to the meeting with the negotiators on the morning of June 17. "Knowledge by an employer of the discharged employees' union activities is a vital element in the proof of a violation of Section 8(a)(3)." N. L. R. B. v. Atlanta Coca-Cola Bottling Co., 5th Cir., 1961, 293 F.2d 300, 309, rehearing denied, 296 F.2d 896; see N. L. R. B. v. Moore Dry Kiln Co., 5th Cir., 1963, 320 F.2d 30; Bituminous Material & Supply Co. v. N. L. R. B., 8th Cir., 1960, 281 F. 2d 365; Osceola County Co-op. Creamery Ass'n v. N. L. R. B., 8th Cir., 1958, 251 F.2d 62; cf. N. L. R. B. v. J. Mitchko, Inc., 3rd Cir., 1960, 284 F.2d 573. Here there was only insignificant evidence that the company knew of any specific employee being engaged in union activities. See Dan River Mills, Inc. v. N. L. R. B., 5th Cir., 1960, 274 F.2d 381, 384. Overman claimed that he had decided to have a fairly comprehensive layoff on June 13 and that Kreischer had made up a list for this purpose by the fifteenth. The Board has deplored the inconsistency of petitioner's position in hiring fifteen men in less than three weeks and then laying off eighteen at the end of that period. While we agree that the employer must often

show a valid business justification to counter evidence of discriminatory motivation, we think the economic considerations are beside the point where there is insufficient evidence to show that the employer had such knowledge as would permit discrimination. Overman ordered the layoff of sixteen employees, about whose union sympathies and affiliations the company knew nothing, half of whom, it turned out, had signed union cards. We could speculate that he took a "stab in the dark," hoping to rid himself of the "wrong" people, that he reduced his working staff so that his subsequent antiunion campaign would be more manageable, and so forth. But none of this rises above the level of conjecture. See Bituminous Material & Supply Co. v. N. L. R. B., supra, 281 F.2d at 367. There were economic reasons and subsequent recalls which Overman and Kreischer relied upon to justify their actions, but these we consider irrelevant. Without significant evidence that Overman or Kreischer knew of any individual union participation, and a failure to show that he struck at a suspected group of employees, his reasons for laying off these people were his business. It is not the place of the Board or the courts to interfere with the managerial prerogative. N. L. R. B. v. McGahey, 5th Cir., 1956, 233 F.2d 406, 412–413; N. L. R. B. v. Coats & Clark, Inc., 5th Cir., 1956, 231 F.2d 567, 572–573; Portable Elec. Tools, Inc. v. N. L. R. B., 7th Cir., 1962, 309 F. 2d 423; N. L. R. B. v. Montgomery Ward & Co., 8th Cir., 1946, 157 F.2d 486.

We reach the same conclusion with regard to the two employees laid off on the succeeding Monday. Neither the Trial Examiner nor the Board made any distinction between these two separate layoffs, the one holding both economically motivated, the other holding them in violation of Section 8(a) (3) and (1). Looking to the record to ascertain whether there is evidence to sustain the Board's finding with respect to the second layoff, we note the evidence that Kreischer visited employee Luzader at his home and inquired whether he or employee Haroff

had signed cards. Both had been laid off the preceding day. Luzader answered that he had signed after the layoff but he did not believe that Haroff had. Kreischer also asked if Luzader knew who the instigators of the union movement were. Luzader replied in the negative. On Monday Haroff was called back and two union men, Mielczarczyk and Hardin, were laid off.

The finding here of a discriminatory layoff in violation of Section 8(a) (3) must fall for the same reasons as the June 17 finding. There is no indication that Skyline Homes had gained any knowledge that the two employees laid off Monday morning had signed union cards. The statement of Luzader that he did not think Haroff had signed a union card did not provide a basis for a belief that Haroff was not a union member.

Aside from this, the Board relies on events subsequent to the layoffs to sustain its position. The company asserts that it gave all the laid off employees, save one, an opportunity to return to work. The Board, on the other hand, states that,

"The record reflects that employee Branton left town and was presumably unavailable for recall, and that seven other employees were laid off and not recalled: Bacon, Knight, B. Lloyd, R. Lloyd, Penney, Stokes, and Watts. Significantly all of these employees had signed authorization cards. It should be noted, however, that there is some question as to whether or not Penney was offered reinstatement."

The Board uses the recall of ten of the laid off employees as evidence of the incredibility of the economic reasons for the layoff. Then from the pattern of the recalls it again draws an inference of discrimination. But the Board's statement quoted above must be set against the record. If it does not square, then the inference cannot stand.

It was admitted by Kreischer and Overman that employee Grover Watts had not been asked to return to work. By

the testimony of Kreischer it was shown that Watts was addicted to drinking and fighting, and was continually getting mixed up with the law and missing work with the result that there was an interference with plant production. Kreischer testified that shortly before the layoff he spoke to Watts about missing work, and the latter had told a story of an ailing sister whom he had gone out of town to attend. Kreischer warned him that if he were lying, it would be "the end." According to Kreischer he found out that Watts had in fact been in another scrape and told him on June 21 or 22 that he could not come back to work after the layoff. Overman confirmed Kreischer's general observations about Watts.

It was stipulated at the hearing that employee Bacon was no longer in the State of Florida. Employee Penney, whom the Board concedes may have received a proper offer of reinstatement, testified that his wife visited Mr. Overman who told her that he had a letter on his desk asking Penney to return to work the following Monday. Penney testified that he never went back to work because he never got the letter. But he also admitted that he had had the impression that he was supposed to reassume his position. Knight, on the other hand, had not been recalled and there is no indication that he was ever again offered employment with Skyline Homes. Employee Robert Lloyd, who was never recalled, testified that he had just been graduated from high school, hoped to go to college, and took the job with the understanding that it would just last for the summer. Bruce Lloyd said flatly that he had refused an offer to return. There is no evidence that employee Stokes had ever been recalled.

It is our conclusion that a pattern of discriminatory recalls depends on the failure to offer reemployment to Knight and Stokes, and a possibility that there was a failure to do so in the case of Penney. We exclude Robert Lloyd from this group because, aside from the fact that he was hired as temporary help, most of the recalls were in the fall at the end of petitioner's traditionally slack season. In regard to Watts, the testimony that he was let go for the reasons aforementioned was not only uncontradicted, but neither the Trial Examiner nor the Board indicated they disbelieved Overman and Kreischer. We are driven to the conclusion that the Board's inferences in this regard are not supported by substantial evidence on the record considered as a whole.

■ We now consider the portion of the Board's decision with respect to warning or interrogating employees in violation of Section 8(a) (1). The conclusions upon which the Board relied to support its order in this regard are supported by substantial evidence. A recitation of the evidence on this phase of the case would serve no useful purpose. However, it may be noted that except for the incident involving Kreischer and Luzader on June 18, all of the acts complained of occurred after the final layoffs on June 20.

■■ The Board adopted the Trial Examiner's finding that Skyline Homes had failed to bargain in good faith with the union. The petitioner argues that Overman proceeded on the assumption that an election would be necessary and that the filing of the charges precluded the election for the time being, rendering further meetings with the union useless. The Board, on the other hand, contends that certification is not a prerequisite to the right of a union to be recognized and the employer must recognize the union unless it entertains a good faith doubt of the union's majority status. It is clear that the filing of unfair labor charges by a union does not relieve an employer of its obligation to bargain in good faith under Section 8(a) (5). N. L. R. B. v. Taormina, 5th Cir., 1953, 207 F. 2d 251; N. L. R. B. v. Harris, 5th Cir., 1953, 200 F.2d 656. Nor must a union be certified by the Board to receive recognition. United Mine Workers v. Arkansas Oak Flooring Co., 351 U.S. 62, 76 S. Ct. 559, 100 L.Ed. 941; N. L. R. B. v. Philamon Laboratories, Inc., 2nd Cir., 1962, 298 F.2d 176, 179; N. L. R. B. v.

Sunrise Lumber & Trim Corp., 2nd Cir., 1957, 241 F.2d 620, cert. den., 355 U.S. 818, 78 S.Ct. 22, 2 L.Ed.2d 34. Moreover, as the Board correctly points out, an employer cannot refuse recognition pending an election unless it doubts in good faith that the union has a majority. N. L. R. B. v. Philamon Laboratories, Inc., supra, 298 F.2d at 179. But, given this good faith doubt, the employer need not negotiate until an election has demonstrated the union's majority status in the appropriate bargaining unit. N. L. R. B. v. Jackson Press, Inc., 7th Cir., 1953, 201 F.2d 541, 544. And "it is also the Board's settled policy not to conduct representation elections during the pendency of unfair labor practice charges." N. L. R. B. v. Trimfit of California, 9th Cir., 1954, 211 F.2d 206, 209 n. 2; see N. L. R. B. Rules & Regulations § 102.95(b). Therefore, in these circumstances, the employer can hardly be called upon to press for an election to which it is not entitled.

■ The decision here turns then on the crucial question of good faith doubt. An employer may not be forced to deal with a union if it has a good faith reasonable doubt that the union has a majority. Admittedly, it would seem harsh that the union in this situation must face an election with unfair labor practices threatening a fair result, and if it loses, then file charges with the Board. But a different rule would allow the union, by filing charges, to coerce an employer, entertaining a bona fide doubt, to bargain without benefit of an election under pain of a Section 8(a) (5) charge. Cf. N. L. R. B. v. Shurett, 5th Cir., 1963, 314 F.2d 43, 44.

The facts of this case, however, render the Skyline Homes' claim of good faith untenable. Union representative Conary told Overman that his organization represented a majority of the employees. This was undisputed. The only indication of doubt in the evidence was Overman's testimony that "I may have said, 'Well, how do I know [that the union represents a majority] ?' I don't recall saying it, I think some time ago. However, I didn't pursue the subject or request them for proof that they did have the majority. I questioned it in my own mind." Thereafter, the company's behavior was wholly inconsistent with the entertaining of a good faith doubt. Overman requested and received a contract from the union and sent it on to Decio; the company sent its counsel to Ocala to take some action in regard to the union, presumably to negotiate. It is apparent that Overman anticipated an election and directed his energies to the union's defeat in that election. However, these actions do not establish the existence of a real doubt as to the union's majority. He made the mistake of believing that majority or no majority an election would be necessary. This view cannot be sustained. On the contrary there must be some manifestation of doubt to the union. In N. L. R. B. v. Southeastern Rubber Mfg. Co., 5th Cir., 1954, 213 F.2d 11, this Court sustained a Board inference that the employer did not refuse to bargain because of a good faith doubt as to the union's majority, but rather because of antiunion animus demonstrated after the refusal. There the union notified the employer on May 12 that it had become the majority representative of the plant employees. The company did not answer the letter. After reciting various 8(a) (1) violations committed thereafter the Court said:

"Furthermore, the facts and circumstances here shown support the Board's inference that respondent's refusal to bargain on and after May 12th was not motivated by a good faith doubt as to the union's majority status, but by anti-union animus and respondent's desire to sway its employees from their union affiliation through intimidation and otherwise coercive tactics." 213 F.2d 11, 15.

Cf. N. L. R. B. v. Poultry Enterprises, Inc., 5th Cir., 1953, 207 F.2d 522. Likewise, in N. L. R. B. v. Trimfit of California, 9th Cir., 1954, 211 F.2d 206, the Court stated a rule which we believe to be applicable to the facts of this case:

"In the instant case we find no evidence to suggest that respondent ever

had a bona fide doubt as to the union's majority status. * * * Not once during the January 30 or February 6 meetings did respondent challenge the union's right to represent the employees. On both of these occasions the union informed respondent that a majority of its employees had signed union cards. There was no necessity for the union to offer proof of the genuineness of its majority claim absent a challenge by respondent." 211 F.2d 206, 210.

The Board had more than ample evidence before it to sustain its findings that Skyline Homes engaged in interrogation and warning of its employees in violation of Section 8(a) (1); and it could scarcely have reached any conclusion other than that there was a wrongful refusal to bargain. Cf. N. L. R. B. v. Bonham Cotton Mills, Inc., 5th Cir., 1961, 289 F.2d 903. So also we find no basis for Skyline Homes' contention that the lapse of time since the filing of the original charges entitle it to an election. An employer will not be permitted to dissipate the union's majority by a series of Section 8(a) (1) violations and then demand that an election be held. Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 64 S.Ct. 817, 819, 88 L.Ed. 1020; N. L. R. B. v. Philamon Laboratories, Inc., supra, 298 F.2d at 181–183; Smith Transfer Co. v. N. L. R. B., 5th Cir., 1953, 204 F.2d 738; see N. L. R. B. v. Southeastern Rubber Mfg. Co., supra, 213 F.2d at 15; N. L. R. B. v. Poultry Enterprises, Inc., supra, 207 F.2d at 525; Joy Silk Mills v. N. L. R. B., 1950, 87 U.S.App. D.C. 360, 185 F.2d 732, cert. den., 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350. Finally, we reject the petitioner's contention that Overman, without authority or authorization to negotiate, was in no position to make a demand upon the union for proof of its majority status. He was the resident manager; he took it upon himself to discuss organizational affairs with the union at some length; he acted as a conduit through which the meagre communications between the union and the company passed. In any event some-

one with authority should have made this point with the union if it was to be asserted.

The petition to set aside the findings and conclusions of the Board is granted with respect to those involving the layoffs alleged to be in violation of Section 8(a) (3) and (1). Otherwise it is denied. The Board's order is modified to the extent indicated above, and, as modified, is enforced.

Modified and enforced.