NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

The GREAT ATLANTIC & PACIFIC
TEA COMPANY, Inc., Respondent.

No. 21436.

United States Court of Appeals
Fifth Circuit.

June 15, 1965.

Theodore J. Martineau, Atty., Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Arnold Ordman, Gen. Counsel, Elliott Moore, Atty., N.L.R.B., Washington, D. C., for petitioner.

Frederick S. Kullman, Samuel Lang, Kullman & Lang, New Orleans, La., for respondent.

Before WISDOM and GEWIN, Circuit Judges, and BOOTLE, District Judge.

GEWIN, Circuit Judge:

This is a petition to enforce an order of the National Labor Relations Board which is premised on violations of sections 8(a) (1) and 8(a) (5) of the Labor Management Relations Act, 29 U.S.C.A. §§ 158(a) (1), 158(a) (5). The events in question arose out of organizing campaigns which were conducted by two unions during 1962 at respondent's Opelousas, Louisiana, store. During the

summer of that year Local 1691, Retail Clerks' International Association, AFL-CIO, engaged in a campaign to organize the grocery and produce employees. This activity culminated in an election victory for the union on September 27. In the fall of the same year the Meat Cutters, Butchers, and Allied Food Workers, Local 327, AFL-CIO, conducted an organizing campaign in the meat department. No representation petition has ever been filed in the Meat Cutters case.

The charges relating to both campaigns were consolidated for hearing before the Trial Examiner. The Board and the Trial Examiner concluded that respondents had engaged in coercive interrogation of employees in connection with both campaigns, had threatened employees with discharge and loss of benefits in connection with the Retail Clerks' campaign, and had refused to bargain in good faith with the Meat Cutters union. Accordingly, the Board issued the usual cease and desist orders.

■■■■ We have no difficulty in concluding that substantial evidence supports the Board's inference of improper interrogation and threats of reprisal during the course of the Retail Clerks' campaign. While much of the testimony on this question was in conflict, credibility issues were resolved in favor of the General Counsel and cannot be overturned.[1] The credited testimony indicates an organized effort by the management and supervisory personnel to determine which employees supported the union. The supervisors carried out their instructions by making numerous inquiries of employees about whether they had signed union authorization cards, whether they knew the names of others who had signed, and how they intended to vote in the impending election. Answers were to be recorded and forwarded to higher management personnel. Although the local management in the Opelousas store had been instructed only to make guarded, discreet, "indirect" inquiries, many of the questions asked were quite pointed. In addition, employee Ellington testified that Store Manager Thibodeaux warned him that a union victory would mean the withdrawal of employee privileges, such as store parties. Thibodeaux also told him that "things were going to get a lot harder if the Union came in." Similar admonitions were directed to employee Ronald Leger. Furthermore, in response to employee Rozas' statement that she would not divulge the names of union sympathizers, supervisor Champagne replied, "Even though if it means your job?" From all the circumstances, we think there was ample evidence for a fair inference of coercion and interference. See, e. g., NLRB v. Camco, Inc., 340 F.2d 803 (5 Cir. 1965); Martin Sprocket & Gear Co. v. NLRB, 329 F.2d 417 (5 Cir. 1964). Hence, that part of the order relating to the 8(a) (1) violations should be enforced.

The Board also concluded that the company had violated section 8(a) (5) by refusing to bargain with the Meat Cutters' union. The company admits that it declined to recognize the Meat Cutters as the representative of a majority of the employees in its meat department, but it bottoms its refusal on a good faith doubt as to the majority status of the union. The Board, in affirming the Trial Examiner, determined that "no reasonable basis existed for the Respondent's asserted doubt as to the Union's majority claim, and in view of Respondent's other unlawful conduct reflecting an attitude of opposition to its employees' union representation, we find that its refusal to recognize the Union was not bottomed on a good-faith doubt of the Union's majority status. * * *" We cannot agree with the Board's conclusion.

The employee unit which the Meat Cutters sought to organize consisted of only four employees: Glinden Leger, Preston Leger, Jr., Annie Belle LaFluer, and Eve-

---

1. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456, 471 (1951).

lina Rozas.[2] Champagne was the supervisor of the meat department. By November 5, three of the employees had signed union authorization cards. Hence, in a letter dated November 21, the Meat Cutters informed the company Vice-President in New Orleans that it represented a majority of the meat department employees in the Opelousas store and that it desired to commence collective bargaining sessions. The union offered to prove its majority status through a cross-check of authorization cards by some neutral third party. After conferring with the district supervisor who had jurisdiction over the Opelousas store, the company responded by a letter dated November 26 in which it declined recognition on the ground that it did not believe the Meat Cutters had the support of a majority of the employees in the unit. The company asserted that the proposed cross-check would serve no "useful purpose." The union renewed its request on November 30, enclosing photostats of the three authorization cards, but the company again refused to bargain, asserting that it believed its employees were entitled to a secret election. At the hearing before the Trial Examiner, the company's asserted reason for its skepticism as to the union's majority status was that two of the employees who had signed cards were relatives of persons of known anti-union sympathies.[3] The company concluded that they would not have signed union cards in the absence of coercion by union personnel.

Clearly an employer may not demand a Board-supervised election in all cases to determine whether or not the union which purports to represent a majority of the employees does in fact have majority status. An uncertified union which represents a majority of its employees is entitled to recognition unless the employer entertains a good faith doubt as to its majority status. See, e. g., Skyline Homes, Inc. v. NLRB, 323 F.2d 642, 647–48 (5 Cir. 1963), cert. denied, 376 U.S. 909, 84 S.Ct. 662, 11 L.Ed.2d 607; NLRB v. Dan River Mills, Inc., 274 F.2d 381, 386–389 (5 Cir. 1960).

When the General Counsel charges that an employer has committed an unfair labor practice, he must produce substantial evidence from which it may be inferred that a violation of the Act took place. Therefore, the burden of establishing a refusal to bargain in good faith rests initially with the General

---

2. The Trial Examiner described the appropriate unit as follows:
   "The complaint alleges that all meat department employees in Respondent's store in Opelousas, Louisiana, including the second man, butchers, meat clerks, and regular part-time employees, but excluding all other employees, guards, meat department heads and all other supervisors as defined in the Act, constitute a union appropriate for collective bargaining. Respondent denies that this is an appropriate unit, but does not suggest any other. I find the unit described in the complaint to be appropriate."
   Of the four employees in the meat department, apparently only two worked full time. Preston Leger, although classified as a "part-time meat clerk," testified that he did "mostly clean-up work" and occasionally weighed meat. He also stated that he worked every Saturday and on some week days when he first began work in September, 1962, but that by the time of the hearing in May, 1963,

he only worked about two Saturdays a month. As noted elsewhere, he had withdrawn his union authorization card by letter dated December 27, 1963. Annie Belle LaFluer was also a part-time employee in the meat department from September 20, 1962, until her termination on January 18, 1963. The Board concluded that she was hired primarily as additional help during the Thanksgiving, Christmas, and New Year holidays and that she worked only when needed. Usually, she came in about one day a week, and when she was terminated the company hired no replacement for her. The Trial Examiner concluded that her discharge was unlawfully motivated, but the Board disagreed and dismissed that allegation of the complaint. See footnote 5 infra.

3. Annie Belle LaFluer's husband was allegedly a supervisor in the produce department of the Opelousas store and Preston Leger, Jr., was the step-nephew of the meat department manager.

Counsel. In the instant case the Board introduced evidence which showed that the company in fact declined recognition and that a majority of the employees had in fact signed union authorization cards.[4] The company in turn advanced the contention that its refusal was based on a good faith doubt as to the union's majority status. When some credible basis for a good faith doubt is advanced by the company, the General Counsel has the burden of establishing that the refusal was in fact improperly motivated. This can be done, for example, by pointing to evidence from which it can be inferred that the delay was designed to give the employer an opportunity to dissipate and undermine the union's strength. See, e. g., Skyline Homes, Inc. v. NLRB, supra, at 649; NLRB v. Southeastern Rubber Mfg. Co., 213 F.2d 11, 15 (5 Cir. 1954); Joy Silk Mills, Inc. v. NLRB, 87 U.S.App.D.C. 360, 185 F.2d 732, 741 (1950). The Board has recognized that the ultimate burden in these cases lies with the General Counsel. See Sunset Lumber Prods., 113 NLRB 1172, 1175.

■ In weighing the factors which are relevant in determining the presence or absence of a good faith doubt, we must be mindful of the dilemmas in which both the employer and the union may find themselves when the union makes a demand for recognition prior to an election. The union, if it cannot obtain recognition as soon as it is satisfied that it represents a valid majority, must suffer the delay of an election with, in some cases, the possible attendant threat that employer unfair labor practices will influence the outcome. Surely recognition is a more desirable alternative than an unfair labor practice proceeding which may come too late to serve the union's purposes at all. On the other hand, the company must have some method by which it can test the validity of the union's claim to majority status if it entertains a good faith belief that the union does not or could not have a majority. Although the company has a right to interrogate employees for purely informational purposes, such a course is an exceedingly risky road for an employer to travel. In a close case where a good faith doubt exists, it is more conducive to industrial peace to rely on Board proceedings than to allow the union to coerce an employer to bargain who has a bona fide doubt as to the union's majority or to encourage the use of self-help techniques by an employer to ascertain whether a majority actually exists. See Skyline Homes, Inc. v. NLRB, supra, 323 F.2d at 648; NLRB v. Shurett, 314 F.2d 43 (5 Cir. 1963); NLRB v. Dan River Mills, Inc., supra, 274 F.2d at 388.

In the instant case the Trial Examiner based his finding of a lack of good faith primarily on certain allegedly improper attempts to influence employees after the Meat Cutters had filed their initial bargaining request. The Board relied, in addition, on the absence of any reasonable basis for the company's refusal. On the whole record, we do not believe there was substantial evidence to support these conclusions.

While there was ample evidence of the company's animus toward the union

4. The company contends that the Board erroneously concluded that the union in fact represented a majority of the employees in the meat department since the card of Annie Belle LaFluer was obtained through the influence of her husband, who was a supervisor. The Board held that Calvin LaFluer was not a supervisor because he had no employees permanently under his direction and control. Although the Board had concluded that Calvin LaFluer was a supervisor in a previous representation proceeding arising out of the Retail Clerks' campaign, it did not feel bound by that determination in the instant case because his status had been agreed to by the parties and was not actually litigated in that proceeding. In the alternative, the Board concluded that the mere presence of Mr. LaFluer at the time his wife signed her card did not constitute substantial evidence of improper influence. We cannot say that either of these conclusions by the Board was unwarranted. Therefore, we conclude that the General Counsel did establish that the union represented a majority of the employees in the unit at the time the requests to bargain were forwarded to the company.

during the Retail Clerks' campaign the previous summer, the company's activities at that time can have only minimal relevance in light of the company's attitude during the Meat Cutters' campaign in November. Apparently the company was unaware of the Meat Cutters' organizational drive until it received the initial request to bargain. In contrast to the intensive anti-union campaign it had conducted in the summer while the Retail Clerks were attempting to organize the employees, the company did not combat the Meat Cutters' efforts with anti-union speeches, it did not conduct an organized campaign to interrogate employees, it did not post anti-union notices about the store, and it made no attempts to discharge or threaten union adherents.[5]

▪ In addition to the fact that there is no evidence that any union cards were in fact obtained by coercion,[6] the Board relies on two incidents which allegedly indicate an anti-union motive and a purpose to delay bargaining in order to dissipate the union's majority. First, on one occasion after the employer had received the first request for recognition from the Meat Cutters, Store Manager Thibodeaux reprimanded employee Rozas for extending her coffee break two minutes over the allotted time. Immediately thereafter, her supervisor, Champagne, inquired as to her reasons for signing a union card. Second, in late December, employee Preston Leger, Jr., after having talked the matter over with his father, voluntarily approached Champagne and discussed the union with him. In the course of the conversation Champagne told Leger he "would think a lot better" of him if he were not a union member. At the end of the discussion Leger requested that Champagne tell him where to write in order to effect a withdrawal of

his union card. The following day Champagne gave Leger the address. When Leger stated that he would write the withdrawal letter the next day, Champagne replied, "Why not write it now?" Leger did. It is undisputed that Leger voluntarily broached the subject of withdrawal and that no one aided him in the drafting of the letter. Champagne was not even present at the time the letter was written. In these circumstances, we think the Board erred in drawing the inference that Champagne coerced or improperly influenced Leger.

Therefore, the only evidence from which the Board could infer that the Company did not act in good faith and refused to bargain for purposes of delay is the interrogation of Rozas. While this incident may well have constituted a technical transgression of section 8(a) (1), it must be placed in its proper context in the whole record for the purpose of determining whether it constitutes substantial evidence of an improper refusal to bargain. We think that, standing alone, the incident is too isolated to warrant an inference of lack of good faith.

Nor can we agree with the Board that there was no reasonable basis for the company's asserted good faith doubt in light of the fact that its suspicions about Preston Leger's desires proved correct. Furthermore, the question whether there was improper influence in obtaining Annie Belle LaFluer's card is certainly arguable. It must be remembered that at the time when an employer is first confronted with a request to bargain, he does not necessarily have at his command all the fact-finding machinery that is available during a full-dress hearing before the Board. This is especially significant where, as here, the union's margin is exceedingly slim. Where the bargaining

5. As indicated in footnote 2, supra, the Trial Examiner found that employee Annie Belle LaFluer had been laid off for discriminatory reasons in January, 1963, but the Board rejected his conclusions in this respect. Its decision on the 8(a) (3) charge is not before us for review.

6. In the letter in which he withdrew his union card, Preston Leger did assert that he did not fully understand what he was doing when he joined the union, but there was no affirmative evidence that he had been influenced in any way at the time he signed the card.

unit is small, it is more likely that management personnel would be familiar with the views of each employee. Authorization cards are certainly appropriate indicators of union strength in a bargaining unit, but in a case in which the company has information which leads them reasonably to believe that certain of the cards do not represent the true wishes of the employees, it is difficult to see how a cross-check by an impartial arbiter would be particularly useful. In a recent case, the Board itself has impliedly recognized that the offer of a cross-check of authorization cards does not impose a duty upon the company to submit to the check or suffer the consequences of a refusal-to-bargain charge. Superex Drugs, Inc., 150 NLRB 97 (1965). In that case the company's refusal to recognize the union was premised on the past experience of the employer that the union would file a representation petition with the Board if its request for recognition was not honored.

On the whole record, we do not feel that there is substantial evidence of improper company motives in declining recognition to the union in the circumstances of this case. Therefore, that part of the Board's order relating to the alleged refusal to bargain is denied enforcement; in all other respects, the order is enforced.