NATIONAL LABOR RELATIONS
BOARD,
Petitioner-Cross-Respondent.

v.

COMPUTED TIME CORPORATION,
Respondent-Cross-Petitioner.

No. 77–3131.

United States Court of Appeals,
Fifth Circuit.

Jan. 15, 1979.

Elliott Moore, Deputy Assoc. Gen. Counsel, John G. Elligers, Supervisor, Fred Havard, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Asso. Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner-cross-respondent.

George C. Dunlap, Robert C. Elder, Jr., Dallas, Tex., for respondent-cross-petitioner.

W. Edwin Youngblood, Director, Region 16, N. L. R. B., Fort Worth, Tex., for other interested party.

Before INGRAHAM, GEE and FAY, Circuit Judges.

FAY, Circuit Judge.

This case is before the Court upon the application of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, §§ 151 *et seq.* (the "Act"), as amended, for enforcement of its Order issued against respondent, Computed Time Corporation (the "Company") on April 7, 1977. Computed Time Corporation, a wholly owned subsidiary of the Armin Corporation of New York was, at all times relevant to this cause, engaged in the business of designing, assembling and selling electronic digital watches.

The pertinent facts and findings of the National Labor Relations Board are set forth below. For reasons enumerated herein, we deny enforcement of the Board's Order in part, and enforce the Order in part.

## FACTS

In the fall of 1974, Computed Time Corporation began production of electronic digital watches at its plant in Arlington, Texas. Throughout 1975, the company experienced rapid growth.

In September of 1975, company officials met with representatives of its corporate parent to devise a production schedule for the coming year. Armin officials, concerned with a post-Christmas lag in demand, urged Computed to reduce manpower and production by forty percent. Arthur Cruse, president of Computed, successfully argued against such a reduction because he didn't want to lose trained employees. Rather, the Company decided to reduce production for the first four months of 1976 while, at the same time, building up a substantial inventory.

In January, 1976, the shot which was heard around the digital watch industry was fired. Texas Instruments, Inc., at the Consumers Electronic Show in Chicago, announced its intention to market a watch at a price substantially below Computed's cost of production. Management at Computed had been aware that Texas Instruments was attempting to develop a cheaper watch, and in fact, Computed had adopted contin-

gency plans which would have enabled it to build a much cheaper watch by the end of 1976. However, at the time of Texas Instruments' announcement, Computed Time Corporation was operating under the industry-wide conviction that the technology which could lead to a $20 electronic digital watch was at least a year away.[1] Thus, on January 26, 1976, Computed management again met with Armin representatives to discuss a revised production schedule in light of the Texas Instruments announcement. While an exact number of employees to be laid-off was not immediately decided, it was clear that reductions would be necessary, and Cruse was directed to develop manpower projections. On February 16, 1976, Cruse was informed that Armin would insist on the layoff of forty direct production employees. Cruse persuaded Armin management to accept a twenty person layoff with another twenty person reduction due to attrition. On February 16, Nathan Jones, Computed's Vice President for manufacturing, was instructed to layoff twenty employees. After meeting with departmental supervisors, twenty individuals were selected for layoff. Jones testified that poor production, bad attitude and absenteeism were the sole criteria used in determining which employees were to be laid off. It is this layoff which the Board found to be designed to discourage Union activity and therefore in violation of Sections 8(a)(1) and 8(a)(3) of the Act.[2]

Meanwhile, early in February, three employees had met with a representative of the International Association of Machinists and Aerospace Workers, AFL–CIO. They had discussed the general aspects of unions and organization drives. Approximately one week later (February 10, 1976) another meeting was held where, again, a general discussion about unionization occurred. This time, however, authorization cards were distributed and signed by those in attendance, and these ten signers agreed to accept other cards for distribution at the plant.

After the layoff, on February 23, 1976, handbills were distributed at the plant announcing a Union meeting that evening. Supervisor Marty Johnston's presence at that meeting was the basis of the Board's surveillance finding discussed below.

## I. THE NO SOLICITATION RULE

The Computed Time Corporation "Employee Handbook" includes the following "no-solicitation" rule:

> Soliciting employees for membership in organizations, sale of tickets, asking for donations, and similar acts are not permitted without the specific approval from management.

Computed Time Corporation, "Employee Handbook" at 9. The Labor Board affirmed the Administrative Law Judges' finding that the "broad restriction" embodied in the rule "must be presumed to be an unreasonable impediment to self-organization" and therefore violative of Section 8(a)(1) of the Act. We agree.

It is well settled that restrictions on employee solicitation during non-working time and on distribution during non-working time in non-working areas are presumptively invalid as an unreasonable interference with Section 7 rights and thus an unfair labor practice under Section 8(a)(1), unless the restrictions are justified by a showing of special circumstances making the rule necessary to maintain production or discipline. *Republic Aviation Corp. v. N. L. R. B.*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); *Republic Aluminum Co v. N. L. R. B.*, 394 F.2d 405 (5th Cir. 1968) (en banc). Accordingly, absent special circumstances which make the rule necessary in order to maintain production or discipline, Computed's broad prohibition is invalid and the order to cease and desist must stand. *N. L. R. B. v. Walton Mfg. Co.*, 289 F.2d 177, 180–81 (5th Cir. 1961).

---

1. At the time of the announcement, the cost of manufacturing Computed's least expensive model was over $30.

2. The Board found Section 8(a)(3) and 8(a)(1) violations with respect to nineteen of the twenty persons discharged. The twentieth person, Marge Peterson, was found to have been excluded from the bargaining unit.

■ The Corporation claims that several factors remove this case from the presumption of invalidity announced in *Republic Aviation*. In particular, the Company points to the Board's findings that no employee was ever disciplined for violating the rule, and that no supervisor had referred employees to the restriction on solicitation of union membership.

The Company further argues that it adopted the rule long before any hint of union activity at its plant. However, these claims do not relate to production or maintenance of discipline and therefore are not such "special circumstances" which will remove this case from the general presumption of invalidity. The rule is invalid and the Board is quite correct in ordering that it may not be maintained. Accordingly, we will enforce the Board's Order that Computed cease and desist from maintaining its no-solicitation rule.

## II. SURVEILLANCE

■ Appellant's next contention concerns the presence of a low level supervisor at an organizational meeting called by non-employee union organizers. The supervisor, Marty Johnston, apparently learned of the meeting through the indiscriminate leafleting of employees preceding the meeting. There is no evidence in the record that the company encouraged him to attend the meeting. Indeed, there is no showing that the company was even aware of his presence. Nonetheless, the Administrative Law Judge found, and the Board adopted the position that the presence of "management representatives" at union functions has "an inherent tendency to impede employees in the exercise of their self-organization rights." Accordingly, the Board rule that such management activity violates Section 8(a)(1) of the Act. After close examination of the facts, however, we cannot say that substantial evidence in the record supports the Board's finding that the Company violated Section 8(a)(1) by Johnston's presence at the meeting. This Court has stated that surveillance is a violation of the Act because it indicates an employer's opposition to unionization, and the furtive nature of the snooping tends to demonstrate spectacularly the state of the employer's anxiety. From this the law reasons that when the employer either engages in surveillance or takes steps leading his employees to think it is going on, they are under the threat of economic coercion, retaliation, etc.

*Hendrix Mfg. Co. v. N. L. R. B.*, 321 F.2d 100, 104–05 n.7 (5th Cir. 1963). *See N. L. R. B. v. Atkins Saw Division of Nicholson File Co.*, 399 F.2d 907, 910 (5th Cir. 1968). Thus, it is clear that mere presence of a supervisor at an organizational meeting, without some additional evidence of coercion, restraint or interference, is not prohibited by the Act. In order for an employer to violate Section 8(a)(1) by illegal surveillance, interrogation or any other unlawful act, he must "interfere with, restrain, [or] coerce" employees in the exercise of their Section 7 rights. 399 F.2d at 910.

Here there is no evidence of any interference, coercion or restraint on the part of the company as a result of Johnston's presence at the organizational meeting. In point of fact, the record reflects that Johnston gained access to the meeting through the directions of two members of the union's in-plant organizing committee. Moreover, Mr. Harvey Christian, a grand lodge representative of the union, testified that Johnston, after being helped into the building, asked if it was illegal for him (Johnston) to attend the meeting. After informing Johnston that his attendance was illegal, Christian testified that he invited Johnston to stay since there was nothing which would occur at the meeting that he desired to keep from the company, and since, in either event, he knew that a "stooge" would carry the information to the company.

Noticeably absent from the record is any evidence from any witness indicating that Mr. Johnston's presence had a coercive impact or effect. Leah Evans, a witness for the General Counsel, testified that the employees did not feel threatened by Johnston's presence:

Q. And that was when Mr. Christian said that if it made anybody nervous, we could ask him to leave?

A. Yes sir.

Q. Was there any response to that?

A. Yes, there was quite a number of people that said, no, it didn't make them nervous at all.

Taking these facts in conjunction with the fact that Johnston was not at the meeting at the instigation or direction of the Company, we are drawn to the conclusion that the Board did not have evidence establishing coercion sufficient to make out a violation of Section 8(a)(1) of the Act. *See N. L. R. B. v. Gary Aircraft Corp.*, 468 F.2d 562, 563 (5th Cir. 1972), *rehearing and rehearing en banc denied*, 468 F.2d 563 (1973).

### III. EMPLOYEE DISCHARGE

Computed's final argument concerns the Board's finding that the Company violated Sections 8(a)(1) and (3) of the Act by laying off nineteen employees in order to discourage union activities. Computed maintains that the evidence for such a finding is insufficient as a matter of law in that it could have known of the union activities of only two such employees, and further, that only nine of the nineteen employees signed a union card or were otherwise engaged in union activity. In addition, the Company maintains that the evidence conclusively establishes that the layoff was motivated solely by economic considerations rather than being prompted, as the Board found, by management's recently acquired knowledge of the union campaign.

We begin our analysis of this claim by recognizing two major considerations which this Court follows in Section 8(a)(3) cases. First, this Court has often stated that "management is for management. *E. g., N. L. R. B. v. McGahey*, 233 F.2d 406, 413 (5th Cir. 1956). It is not the function of either the Court or the Board to second guess management decisions. Management is free to discharge employees for good cause, bad cause, or no cause at all. *N. L. R. B. v. Nabors*, 196 F.2d 272, 275 (5th

Cir.), *cert. denied*, 344 U.S. 865, 73 S.Ct. 106, 97 L.Ed. 671 (1952). "It has, as the master of its own business affairs, complete freedom with but one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a)(3) forbids." 233 F.2d at 413 (citations omitted).

The second consideration is that the burden of proof is upon the General Counsel, and he must present substantial evidence that the discharge was a result of improper motives. *Frosty Morn Meats, Inc. v. N. L. R. B.*, 296 F.2d 617 (5th Cir. 1961). An unlawful purpose is not lightly to be inferred. *N. L. R. B. v. Federal Pacific Electric Co.*, 441 F.2d 765 (5th Cir. 1971). Mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence. *Federal Mogul Corp. v. N. L. R. B.*, 566 F.2d 1245, 1259 (5th Cir. 1978).

An examination of the law in this Circuit reveals that in order to make out a violation of Section 8(a)(3), knowledge by the employer of the discharged employees' union activities is critical. *N. L. R. B. v. Atlanta Coca-Cola Bottling Co.*, 293 F.2d 300, 309 (5th Cir.), *rehearing denied*, 296 F.2d 896 (1961); *Tampa Times Co v. N. L. R. B.*, 193 F.2d 582 (5th Cir. 1952). Moreover, the unlawful element of purpose must be established with respect to each discharge. *N. L. R. B. v. Walton Mfg. Co.*, 286 F.2d 16 (5th Cir. 1961), *rev'd on other grounds*, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962); *N. L. R. B. v. Dan River Mills, Inc.*, 274 F.2d 381 (5th Cir. 1960). Nonetheless, this Court has enforced N. L. R. B. orders of reinstatement when a vast majority of those discharged were known by the employer to be engaged in union activity. *N. L. R. B. v. Nabors*, 196 F.2d 272 (5th Cir.), *cert. denied*, 344 U.S. 865, 73 S.Ct. 106, 97 L.Ed. 671 (1952). However, the ratio of union sympathizers discharged to total employees discharged although probative is not dispositive. Indeed, this Court has recognized that proof that an employer took a "stab in the dark" hoping to "rid himself of the 'wrong' people," sup-

ported by "significant evidence" might well give rise to a Section 8(a)(3) violation. *Skyline Homes, Inc. v. N. L. R. B.*, 323 F.2d 642, 646 (5th Cir.), *rehearing denied*, 323 F.2d 642 (1963), *cert. denied*, 376 U.S. 909, 84 S.Ct. 662, 11 L.Ed.2d 607 (1964).[3]

In the instant case, the Administrative Law Judge concluded that the February 16th layoff was "prompted by management's recently acquired knowledge of the union campaign then in progress," even though the record showed that only three of the nineteen discharged employees were known by Computed to be engaged in Union activity. Moreover, the record shows that at least ten of the laid off employees never supported the union. The Administrative Law Judge discredited the testimony of Computed officers by calculating the number of personnel required to produce the desired number of watches. He concluded that any required reduction in personnel had already been accomplished by attrition. But these calculations are properly within the province of management. Having removed the foundation of the Administrative Law Judges' opinion, we are left with nothing in the record which indicates that Computed's actions were illegally directed at any specific employee. Absent a showing of knowledge by this employer of union activity on the part of at least a significant number of the discharged employees, there is insufficient evidence to support a finding of anti-union discrimination. *Skyline Homes, Inc. v. N. L. R. B.*, 323 F.2d 642, 646 (5th Cir.) *rehearing denied*, 323 F.2d 642 (1963), *cert. denied*, 376 U.S. 909, 84 S.Ct. 662, 11 L.Ed.2d 607 (1964). Accordingly, we refuse to enforce those portions of the Board's Order dealing with the discharged employees, to wit: the cease and desist order and the order of reinstatement and award of back pay.

Enforcement is granted as to that portion of the Board's Order dealing with the broad no-solicitation rule. In all other respects, enforcement is denied.

---

**3.** The "show of force" doctrine has not been adopted by this Court. We note, however, that even if this doctrine were to be embraced in this Circuit, the facts would not substantiate a Section 8(a)(1) or Section 8(a)(3) violation as the General Counsel has failed to demonstrate that a "significant motive" for the discharge was to "discourage membership in any labor organization." *Majestic Molded Products, Inc. v. N. L. R. B.*, 330 F.2d 603 (2d Cir. 1964). *See M. S. P. Industries, Inc. v. N. L. R. B.*, 568 F.2d 166, 176 (10th Cir. 1977).