**NATIONAL CAN CORPORATION,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 15755.

United States Court of Appeals
Seventh Circuit.

March 8, 1967.

Fairchild, Circuit Judge, dissented.

Earle K. Shawe, William J. Rosenthal, Baltimore, Md., Maurice S. Weigle, Chicago, Ill., Shawe & Rosenthal, Joseph K. Pokempner, Baltimore, Md., for petitioner, Goldberg, Weigle, Mallin & Rivkin, Michael L. Sklar, Chicago, Ill., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott Moore, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Leon M. Kestenbaum, Atty., N. L. R. B., for respondent.

Before HASTINGS, Chief Judge, MAJOR, Senior Circuit Judge, and FAIRCHILD, Circuit Judge.

MAJOR, Senior Circuit Judge.

This case is here on petition of National Can Corporation (Company) for review of an order of the National Labor Relations Board (Board), issued June 17, 1966, and reported at 159 NLRB No. 66. In its answer to the petition, the Board requests enforcement of its order. It is conceded by all parties that the Court has jurisdiction, and we so hold.

The Board, in agreement with the Trial Examiner, found that the Company violated Sec. 8(a) (1) of the National Labor Relations Act as amended (29 U.S.C.A. Sec. 151 et seq.), by encouraging the employees to engage in surveillance, by interrogating employees as to their Union [1] sympathies, by threatening employee Kufrovich with possible job elimination and by threatening employees with reduced benefits and stricter work rules if the Union won the election.

The Board found that the Company's conduct between the filing of the representation petition and the holding of the election constituted interference, and set the election aside. The Board further found that the Union had twice requested recognition and bargaining in an appropriate unit, that the Union represented a majority of the employees when these requests were made, and that the Company's refusal to bargain with the Union was not the result of a good-faith doubt of the Union majority but was motivated by a desire to gain time in which to destroy it. The Board accordingly found

---

1. United Steel Workers of America, AFL-CIO, District 31, Sub-District 4.

that the Company's refusal to bargain violated Sec. 8(a) (5) and (1) of the Act. The Board's order requires the Company to cease and desist from the unfair labor practices found, and affirmatively, the Company is required to bargain collectively with the Union upon request.

The Company is a Delaware corporation maintaining an office and place of business in Chicago, Illinois, identified in these proceedings as the Clearing Plant, where it has been at all times material engaged in the manufacture of metal cans and related products. While the Company operates some 24 plants, 3 of which are in the Chicago area, we are concerned here only with its Clearing Plant operation. The Union represents production and maintenance units in a number of the Company's plants, including such a unit at the Clearing Plant. Master agreements have been in existence between the Union and the Company since about 1955. A master agreement effective November 1, 1962, in effect at all times material herein, was applicable to units in 14 plants and is supplemented by local agreements covering variations in working conditions.

The record for review is voluminous. There were 9 days of hearing before the Trial Examiner. The transcript covers more than 2000 pages, reduced to some 500 pages by a joint appendix. The Examiner's decision and recommendations cover 62 pages, and the Company's exceptions thereto, 15 pages. In response to the latter, the Board (by a 3-member panel) in its order stated, "The Board has reviewed the rulings made by the Trial Examiner * * * and hereby adopts the findings, conclusions, and recommendations of the Trial Examiner." In this Court, the Company favors us with the citation of 112 cases, and the Board does almost as well, with the citation of 89.

We shall first consider the Company's contention that there is no substantial support for the Board's finding that it violated Sec. 8(a) (5) of the Act by its failure to bargain with the Union. This

phase of the case had its origin in a letter dated Friday, October 23, 1964, written to the Company by the Union's organizer, Anthony Graczyk, and received by the Clearing Plant manager on Monday, October 26, 1964, which demanded recognition of the Union. The letter stated that a majority of employees had signed Union cards designating the Union as the bargaining agent (Graczyk claimed to have cards signed by 24 employees), and expressed a willingness to present such cards to a neutral party for the purpose of establishing the claim. The letter stated, "The bargaining unit which we claim to represent are all office and factory clerical employees at the Clearing Plant of National Can Company, 5620 W. 51st Street, Chicago, Illinois, but excluding all production and maintenance employees, cafeteria employees, guards, personnel department employees and all supervisory employees as defined in the Act."

Without waiting for a response to this letter the Union, on October 26, 1964, the day the demand was received by the Company, filed an election petition with the Board, describing the same unit as that in the demand letter, in which the number of employees was estimated at 45. A copy of this petition was received by the Company on the following day.

At a pre-hearing conference held at the National Labor Relations Board regional office in Chicago on December 7, 1964, for the purpose of setting up the details for a Board-conducted secret ballot election, counsel for the Company informed the Union that the Company was unable to determine from the demand letter and the petition which employees the Union was seeking to represent. The Union was asked particularly whether it was seeking to represent the employees of the Corporate Engineering Department, the Corporate Industrial Engineering Department, the Area Quality Control Department and the District Sales Office.

During the course of the conference, the Company and the Union reached accord on the exclusion of the employees

of the Corporate Engineering Department, the Corporate Industrial Engineering Department and the Area Quality Control Department. A "Stipulation for Certification Upon Consent Election" was then entered into in the following unit, "All office clerical employees and all plant clerical employees at the Employer's plant located at 5620 West 51st Street, Chicago, Illinois; excluding production and maintenance employees, cafeteria employees, Corporate Engineering Department, Corporate Industrial Engineering Department, Area Quality Control employees, professional employees, confidential employees having access to labor relations data, guards and supervisors as defined in the Act." It was agreed by the parties that this stipulated unit was composed of 40 employees.

The Company in its effort to justify its failure to recognize the Union, as demanded in the latter's letter of October 23, relies in the main upon two propositions, (1) the Company was under no obligation to recognize and bargain with the Union for want of a clear, unambiguous and unequivocal demand, and (2) the Union made no demand in a unit appropriate for collective bargaining.

■ The Board has often held that where a Union's request to bargain is ambiguous, equivocal or otherwise vague, an employer is under no duty to accede to such request, nor is the employer under any obligation to clarify or resolve such infirm demand. Among such cases are Sportswear Industries, Inc., 147 NLRB 758; Orkin Exterminating Co. of Kansas, Inc., 136 NLRB 630, 641–643, and Bailey Grocery Co., 100 NLRB 576, 579.

This Court in National Labor Relations Board v. Jackson Press, Inc., 201 F.2d 541, refused to affirm a Board finding that an employer had violated Sec. 8(a) (5) of the Act, holding that the Union's request to bargain was ambiguous. In so holding we quoted (page 544) from the Board's decision in *Bailey Grocery Co.*, as follows:

" ' * * * we do not believe it incumbent on an employer to resolve an ambiguity in a request to bargain. On the contrary we believe that a union representative, who is presumably versed in labor matters, should clearly define the unit for which recognition is sought. Such a requirement imposes on the union representative only the obligation to say what he means. Failing to do so, he cannot be considered as having made the sort of request to bargain which imposes upon an employer a legal obligation to comply.' "

In *Orkin*, the Union by telegram and subsequent letter demanded a unit covering "all exterminating servicemen and plant workers excluding office, clerical and supervisory employees," and sent these demands to one of the Company's six operating locations in Kansas City. At no time in claiming recognition from the Company did the Union describe the unit in which it claimed to represent employees in the terms used in the subsequent complaint to describe the unit, nor did it describe the unit as the one found appropriate by the Trial Examiner. The Trial Examiner, with the Board affirming, examined in detail all of the various meanings that that demand would have in the context of the Company's operating situation, and stated (136 NLRB at 642):

"It is my opinion that the unit described by the Union in making its claim for recognition upon the Respondent was, at least, from the standpoint of General Counsel's position, an ambiguous unit on its face."

■ The Board has also enunciated the rule that a demand for recognition must be made in a unit appropriate for collective bargaining. In *Sportswear Industries*, the Board stated (147 NLRB 760):

"It may be that the unit now claimed by the General Counsel as appropriate, limited in effect to warehousing employees, and excluding servicemen because of a difference in interests, may also be appropriate. But whether such a unit would have been appropriate when the Union made its claim

for recognition on March 25 is not a pertinent consideration. Once having defined the unit it claims to represent, and having made a bargaining demand on that basis, the Union has thereby established the frame of reference for measuring the validity of its demand." (The last sentence is particularly applicable to the situation before us.)

In Barlow-Maney Laboratories, Inc., 65 NLRB 928, 943, the Board stated:

"Assuming that the unit as defined ex post facto in the Trial Examiner's findings could be deemed an appropriate one and further assuming that the majority of employees included therein had given authorization cards to the Union, the record fails to show that the Union ever requested the employer to recognize it as the bargaining representative of such a group. Because a prior appropriate request for bargaining is a condition precedent to any finding of a refusal to bargain, we think the Trial Examiner erred in finding a violation of 8(a) (5) in this case."

■ One fact which emerges clearly and unmistakably from the welter of confusion and contradiction which permeates the record is that the Union's demand for recognition was ambiguous and was not made in a unit appropriate for collective bargaining. We reach this conclusion notwithstanding the finding of the Trial Examiner to the contrary. In support of this conclusion, we call attention to some of the more salient facts which in the main are not disputed and do not depend upon credibility findings. The Company introduced documentary proof showing that there were 60 employees in the unit, which included "all office and factory clerical employees at the Clearing Plant," a number of whom were covered under an existing collective bargaining agreement.

At the prehearing conference Graczyk, an experienced Union organizer, made clear that in his demand letter of October 23, he intended to include all of the employees in the Corporate Engineering, Industrial Engineering and Art Quality Control Departments, as well as in the Industrial Sales Department. Graczyk in this respect testified:

"Q. Are you in a position, Mr. Graczyk, today to specify whom you intended to include within the unit specified either in your letter of October 23rd or General Counsel's Exhibit 1-A?

A. Everybody who was not in the union in the way of white collar workers. Does that make it a bit plain to you, Mr. Rosenthal?

Q. Does that include white collar technical workers in Corporate Engineering?

A. Everybody.

Q. It would include (the white collar technical workers in Corporate Engineering.)

A. Yes."

■ The Board on brief takes no issue with the Company's assertion that this testimony supports its contention that the October 23 demand sought an inappropriate unit of 60 employees. Rather, the Board in effect argues that the testimony should be ignored on the premise that the Union's demand statement affords "the frame of reference for measuring the validity of its demand," and that the employer "is not privy to the union representative's thoughts." The Board then states, "Accordingly, the Board properly decided this case on the basis of the Union's written demand, not Graczyk's desires." The Board cites in support of this argument our decision in National Labor Relations Board v. John S. Swift Co., Inc., 302 F.2d 342, 346, which clearly is not in point. In our view, the Board's argument on this important point is fallacious. While the general rule may be as stated by the Board, we think it inapplicable where, as in the instant case, the demand letter was couched in ambiguous and uncertain terms, as all parties subsequently recognized. Graczyk as author of the demand letter was better qualified than any other person to state the class of employees

included in the unit which he had proposed. The casting aside of his testimony was, in our judgment, error.

Counsel for the Board amended the complaint to allege a unit different not only from that proposed but also from that in which the election was conducted. At that time he contended that the unit sought in the demand letter of October 23 consisted of 50 to 55 employees, including those whom the parties had agreed to exclude at the December 7 meeting. The colloquy between the Examiner and Mr. Gittler, counsel for the Board, is illuminating.[2] Later in the hearing the general counsel contended that the unit described in the demand letter consisted of only 44 employees, and on that premise it was claimed that the Union had a majority. Evidently it was thought imperative that the number of employees in the unit be reduced; otherwise, there was no basis for the claim that the Union had a majority. It is no wonder that the Examiner late in the hearing stated, "Let me ask General Counsel, because I am still baffled if the unit sought in the letter of October 23 is substantially the same as the unit in which the election was held * * *."

With all the uncertainty and confusion with respect both to the scope of the unit proposed and the employees contained therein, which even the Board's general counsel was unable to resolve until near the end of a lengthy hearing, it is incredible that the Company should be charged with such knowledge at the time it received the demand letter.

Even so, the Trial Examiner in his decision spent considerable effort in reasoning that the demand of October 23 covered a unit limited to 44 persons, which did not constitute a substantial variance from the 40 employees included in the unit agreed upon by the parties on December 7, 1964. The Examiner in this respect further found that the letter of October 23, 1964, "was of sufficient particularity as to apprise Respondent [Company] of the unit the Union sought to represent, and was not, as contended by Respondent [Company] ambiguous."

It is our conviction that the record furnishes no substantial support for this finding, and it is rejected.

On this phase of the case, we think it pertinent to observe that both the Union and the Company treated the former's demand for recognition as they had on numerous previous occasions. It had become the practice for the Union to demand recognition with the right to bargain, and at the same time file a petition for a Board-conducted election. This practice was to the advantage of the Union. In order to obtain recognition it was required to show that it represented a majority of the employees in an appropriate unit; to obtain an election it was only necessary that it allege

---

2. "(Trial Examiner) Now, you took issue when Respondent said there were 60 in the larger unit. Approximately, what is your approximation?

(Mr. Gittler) My information is to the effect that the initial unit encompassed approximately 50 to 55 people.

(Trial Examiner) In other words, the undisputed—the unit in which the vote was taken was 40; therefore, there is a substantial variance to the extent that the unit is 50, 55 or 60 if the larger unit is used?

(Mr. Gittler) I don't know if that is substantial, sir.

(Trial Examiner) Well, we won't haggle about terms. It might be substantial in the fact that it takes in different classifications of employees.

* * * * *

(Trial Examiner) Well, in making the observation I did, it is obvious that the parties have recognized there was a variation between the two units; otherwise they wouldn't have specified the way they did.

* * * * *

(Trial Examiner) We have a situation where the union made a demand and I am presuming certain things, because without them the whole case will fall anyway, made a demand on October the 26th. The demand was for a large unit, and I think that was the only demand it made. I don't think that is disputed.

Subsequently, for reasons which may be developed in the hearing, parties agreed on a different unit. I'll bet it was a unit included within the unit on which the demand had been made."

that it was supported by 30% or more of such employees (Sec. 9(e) of the Act).

 This practice has been recognized as a valid defense to a failure to recognize and bargain with a union. In National Labor Relations Board v. Great Atlantic & Pacific Tea Co., Inc., 5 Cir., 346 F.2d 936, 942, the Court stated:

"In a recent case, the Board itself has impliedly recognized that the offer of a cross-check of authorization cards does not impose a duty upon the company to submit to the check or suffer the consequences of a refusal-to-bargain charge. Superex Drugs, Inc., 150 NLRB 97 (1965). In that case the company's refusal to recognize the union was premised on the past experience of the employer that the union would file a representation petition with the Board if its request for recognition was not honored."

The Examiner, after finding that the Company violated Sec. 8(a)(5) of the Act by its refusal to recognize and bargain with the Union in response to the latter's letter of October 23, 1964, also found "that on December 7, 1964, Union Attorney Gilbert Feldman, then engaged in representing the Union, requested recognition of the Union in the 'smaller' unit, and that said demand was a new and separate demand." This finding is based on the testimony of Feldman, who testified that after the Examiner had found that the unit described in the demand letter of October 23 was composed of 44 employees and after the parties had agreed to an election in a unit composed of 40 employees, he approached Earle Shawe, a Company official, and stated, "Earle, it doesn't make any difference. We have counted our cards, and whether you include a unit before the transfer or after the transfer, in either case we have a majority of cards from the people who would be included," to which statement Shawe replied, "Well, we are going to see about that." After this conversation the parties worked out the remaining details pertaining to the election which was set for January 15, 1965.

Feldman's statement did not constitute a demand for recognition, particularly in view of the fact that it was made during a meeting held for the purpose of arranging for an election requested by the Union. The single case cited on this point is J. J. Newberry Co., 153 NLRB No. 135 (1965), 59 LRRM 1669, 1670. In that case, as here, the Trial Examiner had found a demand for recognition and refusal to bargain based on a conversation between representatives of Union and management. The Board disagreed with the Examiner and in so doing stated, "It is clear that the parties were meeting on that day solely for the purpose of discussing details for an election, the course on which they had both already decided as the means for fully resolving the Union's representation claim."

 On the basis of the reasoning thus employed, which we think is sound, we hold that there was no justification for the Examiner's conclusion of an 8(a)(5) violation based on Feldman's testimony.

As already noted, the parties in the December 7 meeting agreed to an appropriate unit composed of 40 employees and to an election, with the opportunity for the employees of that unit to determine if a majority was in favor of representation by the Union. The election was held January 15, 1965, with 19 votes cast for and 21 against the Union.

The Company urges with some force that the Union was never freely and validly designated as the bargaining representative of a majority of its employees in any unit appropriate for collective bargaining. For the purpose of establishing such majority, counsel for the Board offered a number of cards signed by employees, sometimes referred to as dual-purpose cards, authorizing representation both for the purpose of collective bargaining and for an election. Many of such signers testified as to the circumstances under which the cards were sign-

ed. After reviewing such testimony, the Trial Examiner found:

"I therefore find that the essential majority, in the unit of 40, who voted in the election, was 21, and that, at all times on and after October 23, 1964, the record discloses, the Union had 22 valid authorization cards."

■ In view of what we have previously held, the only unit involved was that composed of 40 employees, which was formulated by consent of the parties. In such unit the election was held, also by consent. Such being the situation, it is not discernible how the issue under consideration is of vital importance. Therefore, no good purpose could be served in analyzing the testimony as it relates to the validity of the cards or in discussing the cases relied upon by the respective parties. Even though some cards were signed under a misapprehension as to the purpose for which they would be used, that alone would not be sufficient to invalidate them. This issue has recently been considered by this Court in National Labor Relations Board v. Fosdal, 367 F.2d 784, and decided in favor of the Board.

Following the election of January 15, 1965, the Union filed a petition entitled, "Objections to Conduct Affecting Results of Election," with the request "that it be certified as the collective bargaining representative in the stipulated unit." The petition contained two objections, (1) that "From the time of the filing of the petition [for election] on October 26, 1964 to the date of the election on January 15, 1965, said Employer continuously granted and promised wage increases to the Employees in the unit in an effort to coerce and intimidate them to vote against the petitioner," and (2) that during the same period of time the employer "continuously threatened numerous Employees with respect to their conditions of employment should they vote for the charging party." After notice to all parties, a hearing was conducted by the Board's Regional Director, who in his report exonerated the Company from the charge made in objection (1) and found

that charges made in objection (2) "could have had a substantial effect upon the results of the election herein and that they should be resolved following a hearing, in which testimony and/or other evidence is presented." By order dated April 28, 1965, the Board directed that a hearing be held to resolve the issues raised by the Union's objection (2), and that such hearing be consolidated with the complaint issued March 31, 1965.

The Board found, in agreement with the Trial Examiner, that the Company violated Sec. 8(a) (1) of the Act by encouraging employees to engage in surveillance, by interrogating employees as to their Union sympathies, by threatening employee Kufrovich with possible job elimination and by threatening others with reduced benefits and stricter work rules if the Union won the election. The Board in support of the 8(a) (1) violations relied upon testimony of a number of employees as to conversations which they had with four of the Company's high ranking supervisors. The Board also found that the Company's conduct between the filing of the petition and the holding of the election constituted interference, and set the election aside.

The Company contends that statements made by its supervisors in the conversations relied upon by the Board were no more than the expression of views, argument and opinion, permissible under Sec. 8(c) of the Act.

■ A reading of the case law demonstrates that it is oftentimes difficult to determine the line between employer conduct permitted and that prohibited by the Act. In making such determination, courts must keep in mind that the credibility of witnesses is ordinarily a matter for the Trial Examiner and the Board. On the other hand, a court is more than a rubber stamp and "is not barred from setting aside a Board decision when it cannot conscientiously find the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal

Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456. For a good discussion of the duty of a reviewing court see the recent decision of this Court in United Insurance Co. of America v. National Labor Relations Board, etc., 371 F.2d 316.

It is also relevant that the Company had no history of union hostility or objection to the principle of collective bargaining. In fact, it had bargaining agreements with many unions, including those representing employees at its Clearing Plant, other than employees engaged in office and clerical work (the unit for which recognition was sought). In all of its vast dealings with unions, there is not a hint of unfair labor practices prior to those alleged in the instant proceeding.

The Board relies entirely upon some twenty conversations between employees and Company supervisors, which took place between the time the Union first demanded recognition and the election. The Board asserts that this course of conduct was carried on by the Company in order to dissipate the Union majority and goes so far as to state on brief, "We submit that this is ample grounds for concluding that the Company caused the defection of 3 of the Union's supporters." This purely speculative conclusion is without evidentiary support. If it had been essential to dissipate the majority by which the Union lost the election, the Board could just as well have speculated that the number was 6, or any other number. Closely akin to this argument is the Board's assertion that the Company's refusal to recognize the Union was "merely to afford time to take action to dissipate the majority." This argument overlooks the fact, as we have previously shown, that it was the Union which caused the delay by initiating the proceedings for an election, before the Company had an opportunity to determine if the Union represented a majority of employees in an appropriate unit.

We think we should not overlook, as the Examiner and the Board apparently did, that the Company during the period involved, in conversation and in writing continually assured the employees that they were free to vote any way they desired and that there would be absolutely no reprisal or discrimination against anyone. A letter was sent to each employee, which stated in part, "It is absolutely false for anyone to say you can be discriminated against as the result of the way you vote or the outcome of the election," and "Any discrimination by unions or companies because of the way an employee exercises his or her right of free choice is specifically prohibited by the law! We intend to comply with the law. We assure you that your rights will be fully protected at all times."

Inasmuch as the Board's case depends entirely upon the appraisement of conversations which took place between employees and Company supervisors, we think the real issue is whether such conversations contained a "threat of reprisal or force or promise of benefit." In this connection, as shown, the Regional Director on objections filed by the Union exonerated the Company because of alleged "promises and grants of benefits," and found only that the charge of "alleged threats" should be resolved by a hearing.

We have reached the firm conclusion that the record when considered as a whole does not support the Board's finding of an 8(a) (1) violation. In so doing we have given due weight to the findings of the Trial Examiner who generally credited the testimony of employees and, where in conflict, rejected that of Company witnesses. To discuss the evidence, even the findings of the Examiner with reference to all of the numerous conversations involved, would prolong this opinion beyond any permissible length; however, we feel obliged to discuss the incidents which we regard as the most important.

Inasmuch as Kufrovich was the only employee found to have been directly threatened with discharge, we shall first consider the situation as it pertains to her. She testified that she went to the office of assistant personnel manager

McGovern for a purpose connected with her employment, where the following conversation, so far as material, took place, " * * * he had asked me if and why I was so dead-set on bringing a union into the office. I told him my reason for it was because I wanted job security. He then stated how long—that being with the company so many years, why I didn't think I had job security, and I told him there were circumstances working with the company so long, where people have been discharged after a period of five and six years service. He then asked why, being so dead-set on a union, why I didn't think I had job security now working for the company this many years, and with my previous answer, he came back and said that, 'Do you think that your job cannot be eliminated?' And I told him that 'I realize my job, as it is, can be eliminated at any time.' But he couldn't do anything while we were in the process of organizing a union." The witness was asked, "Were you afraid of McGovern?" and she replied, "No." She also stated, "I didn't care one way or the other whether he eliminated my job." McGovern admitted having a conversation with the witness, but denied asking her if she thought her job could be eliminated. He testified that she stated in the conversation, "If there is only one vote for the Union you know who it will be." The Examiner credited Kufrovich.

Based on Kufrovich's version of this conversation, it amounts to no more than an exchange of views held by the respective parties. Neither knew anything after the conversation that they did not know before. Kufrovich was aware of her rights and, as she testified, was not afraid of McGovern. In our judgment, the conversation furnishes no support for the Board's finding that it constituted a "threat of reprisal."

The Trial Examiner in connection with the charge of threats found:

"Dorothy T. Keslin asserted that, in December 1964, McGovern asked her what her viewpoint on the Union was, and she responded anything that would benefit her financially she was in favor of. This was her only conversation with McGovern relative to the Union."

McGovern's version of this conversation was that Keslin initiated it "by asserting that there was a lot of confusion in the office concerning the election, that he confined his observation to the fact that the employees would decide whether they wanted a Union or not when the election was held."

The Examiner credited the employee's version of the conversation. This finding is typical of other findings based on conversations had between supervisors and employees. Such conversations furnish no support for the Board's finding of coercion or intimidation.

A case much in point is the decision of this Court in Sax v. National Labor Relations Board, 171 F.2d 769, where the Board had found a violation of Sec. 8(1), based on the Company's interrogation of employees concerning their Union membership and organizational activities. In denying enforcement of the Board's order in the respect stated, this Court, in an opinion by Judge Sherman Minton (later a Justice of the Supreme Court), stated (page 773):

"Mere words of interrogation or perfunctory remarks not threatening or intimidating in themselves made by an employer with no anti-union background and not associated as a part of a pattern or course of conduct hostile to unionism or as part of espionage upon employees cannot, standing naked and alone, support a finding of a violation of Section 8(1). In Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430, the Supreme Court said: 'Accordingly, decision here has recognized that employers' attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's guaranty. [National] Labor [Relations] Board v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348. Decisions of other courts have done like-

wise. [Cases cited.] When to this persuasion other things are added which bring about coercion, or give it that character, the limit of the right has been passed. [Cases cited.] Cf. [National] Labor [Relations] Board v. Virginia Electric & Power Co., supra. But short of that limit the employer's freedom cannot be impaired.' 323 U.S. at pages 537–538, 65 S.Ct. at page 326, 89 L.Ed. 430."

On the issue of surveillance, much stress is placed on the testimony of the witness Janetzke. Concerning this testimony the Board on brief states, "On January 14, 1965, during the morning break in the cafeteria, employee Thomas Janetzke told Vieth that he had attended a union meeting the previous evening. Vieth responded by asking Janetzke how he thought Ray Wheeler would vote, and Janetzke replied that Wheeler would probably vote 'no,' because his father and Plant Manager Fehrmann were good friends. Vieth then asked Janetzke how he thought Ron Sitar would vote, and Janetzke answered that he thought Sitar would vote 'yes.' Vieth also inquired as to how Rejmenczak would vote, but Janetzke did not know."

■■■ We need not look to the rejected testimony of supervisor Vieth for an explanation of this incident. Rather, we look to the cross-examination of Janetzke, which discloses that the conversation was initiated by him and that he voluntarily gave the information to Vieth.[3] It is significant that Janetzke not only voluntarily revealed to Vieth that he attended a meeting for the purpose of finding out how the employees stood on the Union but that he found "they were unsure." This is corroborative of our previous rea-

soning that it is doubtful if the Union ever had a majority in an appropriate unit.

We think a highly significant incident which throws light generally on the phase of the case under discussion has to do with a conversation which plant controller Hardy had with employee Rejmenczak. As to this testimony, the Examiner found:

"Hardy stopped Rejmenczak, as Rejmenczak was passing Hardy's desk, and inquired if either McGovern or Vieth had approached him about the Union. Rejmenczak responded that McGovern had talked to him and had explained the Company's side. Hardy inquired if Rejmenczak thought he would have obtained his promotion, from checker to shipping clerk, if the Union had represented the employees. Hardy asserted that in such an event promotions would have been on the basis of seniority. Hardy then mentioned some of the fringe benefits which the clerical employees presently had, and might not receive if the Union was successful, specifically profit-sharing and sick pay benefits, which Rejmenczak asserted were somewhat better than the plant employee benefits. Rejmenczak acknowledged that Hardy stated that he did not know, for certain, but thought the employees would not have profit-sharing because the Union would not allow them to have profit-sharing. Hardy also advised Rejmenczak that when the Union came in that he would have to punch a timeclock and adhere to the allotted time for break periods and lunch. Hardy suggested if Rejmenczak had any further questions that he should confer

---

3. "Q. Now, on the 14th, will you tell us what Mr. Vieth said to you and what you said to Mr. Vieth?
 A. On the 14th of January, 1965?
 Q. Yes.
 A. I was sitting in the cafeteria and Mr. Vieth came up to me and I said to him, 'I'm not sure about your decision.' He sat down and I told him then that I was at the Union meeting the night before.

 Q. You volunteered this to him?
 A. I volunteered this to him.
 Q. Go ahead.
 A. I explained to him about what happened at the meeting and the people that went there. I went there to find out how the people were standing for the Union and I told him from the questions that they asked Tony Graczyk that they were unsure."

either with Hardy, Vieth, or McGovern."

As to a second conversation between the same parties on election day, the Examiner found:

"At that time Hardy approached him and asked him if he had thought over all the benefits the Company had to offer him, advising Rejmenczak that he might not have profit-sharing if the Union came in, that he would have to punch a timeclock in the morning, that lunch periods would be strictly limited, as in the plant. Hardy called Rejmenczak's attention to the fact that his hospitalization, sick pay and vacation benefits were presently better than those existing in the plant. Hardy advised Rejmenczak that he could vote any way he wanted to, that his future was in his hands and 'don't hinder it in any way.' He also advised Rejmenczak that the Company's hands were tied because the Union was trying to get in, 'But, give us time.'"

██ Again we think the findings just quoted disclose only a friendly conversation between a Company supervisor and an employee, in which the former expressed his opinion as to the benefits which the unorganized employees had, in contrast with what they might have with the Union. The first conversation concluded with the suggestion by Hardy, "if Rejmenczak had any further questions that he should confer either with Hardy, Vieth, or McGovern." Any doubt that Rejmenczak was interested in obtaining Hardy's views is completely dispelled by the former's cross-examination, not mentioned by the Examiner. We need not set forth this lengthy cross-examination for the reason that the Examiner in his decision stated:

"Finding no evidence that Hardy made any promise of economic benefits, or other benefits, * * * I will recommend dismissal of those allegations." (Joint appendix, page 25.)

Notwithstanding the Examiner's findings in this respect, as well as the action of the Regional Director in overruling the Union's objection dealing with alleged promises and grants of benefits, the Board in its brief places reliance upon the testimony of Rejmenczak.

Another conversation discussed by the Examiner took place January 14, 1965, between employee Budrik and plant manager Fehrmann. A conversation of similar purport took place between Watkins and Fehrmann. As to these conversations, the Examiner found that they furnished no support for the charge of threats or promises.

We perhaps should not conclude our discussion of the Board's findings without reference to the testimony of Geraldine Jaros, which is strongly relied upon in support of the contention that the Company encouraged employees to engage in surveillance. As to this testimony, the Board on brief states, "In mid-October 1964, Personnel Manager Vieth called steno-clerk Geraldine Jaros into his office and said he had heard that she was invited to attend a union organizational meeting. Vieth 'told [her] that he would like it very much if [she] would attend this meeting and report back to him about what the union had to offer these employees.' Jaros replied that she 'would have to think about it because it put [her] in a very, very awkward position,' and later that day she told Vieth that she would not attend." It might be added that the conversation took place in Vieth's office while she was taking dictation, and that she told him she would vote for the Union. She admitted on cross-examination that Vieth had previously stated that he couldn't tell her to attend or not to attend the meeting, but that it was up to her.

Vieth testified that it was Jaros who brought up the subject of the Union by mentioning the fact that he probably had heard that she had been attending Union meetings. He testified that he advised her that it was her business if she attended the meetings, and was no concern of his. The Examiner credited the testimony of Jaros. Jaros evidently was a biased witness. She attempted to vote in the election even with knowledge of the fact that she previously had been de-

clared ineligible by agreement of the parties.

In our view, under the circumstances it is doubtful if the testimony of Jaros, disputed by Vieth, should have been credited, but even if accepted at face value it shows that she told Vieth point-blank that she was for the Union, gave her reasons why and refused to attend a Union meeting for the purpose suggested by him. How there can be any basis for the thought that there was any coercion, threat of reprisal or intimidation in this conversation is more than we can comprehend.

More than that, the Jaros incident was beyond the issue in the case. The Examiner in his decision stated:

"The principal issues raised by the complaint, as amended, and answers thereto, and litigated at the hearing are whether the Respondent: (1) on and after October 26, 1964, when it was requested to recognize and bargain, and on or before January 15, 1965, when an election was held by the Board, engaged in a course of conduct designed to undermine the Union's majority status * * *."

The Jaros incident took place some ten days prior to the filing of the Union petition on October 26, 1964. As previously shown, the unfair practices relied upon by the Union in its objection to the election were all alleged to have occurred between October 26, 1964 and January 15, 1965.

The Board, in Goodyear Tire and Rubber Company, 138 NLRB 453, 454, held that in consent or stipulated election proceedings no objection would be considered which was based on conduct or events occurring before the date of the filing of the petition.

The Board suggests opprobrious conduct on the part of the Company, which it characterizes as a "pattern" or "campaign" against the Union. It is no doubt true that the Company, while agreeable to unions generally, was opposed to the unionization of its office and clerical employees and that it freely gave expression to such opposition. This it had a right to do, providing it expressed its opposition within permissible bounds. Characterizing its conduct as a "campaign" or "pattern" does not aid the Board's case. A careful study of the entire record leaves us with the firm conviction that there was nothing in the conversations between Company supervisors and employees which can be properly found to be a "threat of reprisal or force or promise of benefit." In any event, there is no basis even for speculation that any employee was coerced, intimidated or restrained from freely casting a secret ballot either for or against the Union. To think otherwise is to cast a reflection on the intelligence of the employees involved.

We think no purpose could be served in any further citation or discussion of the many cases called to our attention. Every case depends on its own facts. We must decide this case on the record before us, not on that which was before a court in some other case.

Our conclusion is that the record when considered as a whole does not furnish substantial support for the Board's order. Therefore, the Company's petition to set aside the Board's order is granted and, consequently, the Board's petition for enforcement is denied.

FAIRCHILD, Circuit Judge (dissenting.)

I respectfully record my dissent. We differ in our interpretation and evaluation of the record. In my view there is substantial evidence in the light of the record considered as a whole to support the board's findings of unfair labor practices. I would enforce the order.