COLECRAFT MANUFACTURING CO.,
Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 18, Docket 31038.

United States Court of Appeals
Second Circuit.

Argued Sept. 19, 1967.

Decided Nov. 22, 1967.

Feinberg, Circuit Judge, dissented in part.

1001

Joseph F. Shramek, Jaeckle, Fleischmann, Kelly, Swart & Augspurger, Buffalo, N. Y., for petitioner.

Alan D. Eisenberg, Washington, D. C., (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Elliott Moore, National Labor Relations Board, Washington, D. C., on the brief), for respondent.

Before LUMBARD, Chief Judge, and WATERMAN and FEINBERG, Circuit Judges.

LUMBARD, Chief Judge:

Colecraft Manufacturing Co., Inc. petitions to set aside an order of the National Labor Relations Board requiring petitioner to recognize and bargain with the Textile Workers Union of America, to reinstate employees with back pay and to cease and desist from enumerated unfair labor practices. 162 NLRB No. 69 (1966). The Board cross-petitions for enforcement of its order. This court has jurisdiction under § 10(f) of the Nation-

al Labor Relations Act, 29 U.S.C. § 160 (f) as petitioner's plant for manufacture of laminated plastic table and counter tops is in Lancaster, New York.

During the fall of 1965 the Textile Workers Union engaged in an organization campaign at petitioner's plant. On Friday, November 5, 1965 representatives of the union met with Norman Cole, vice president of Colecraft, and demanded recognition of the union as bargaining agent for all of petitioner's production and maintenance workers on the basis of signatures on union authorization cards. Cole was joined by his brother, Wallace Kowalewski, who requested to see the cards. After examining the cards, the brothers declared that the union did not possess a majority and said they would have to consult with their lawyer.

The union representatives expressed the hope that there would be no retaliation against any employees because of their visit. Cole replied, "I took a labor relations course. I know what I can do and can't do. I know I can't fire for union activity, but I can fire for absenteeism or tardiness." That afternoon David Ostrowski was discharged for missing too much work and for tardiness.

Colecraft's management met with its lawyer to discuss the situation. While that meeting was in progress, the union vice president telephoned to find out what had been decided. Company counsel informed him that there was a bargaining unit question and that the company felt that six "co-op" students employed in Colecraft's plant were not properly part of the bargaining unit. They were high school students who worked part time in the plant and received academic credit for their work.

The union sought to include these students in the bargaining unit. Five of the 34 cards which Cole and Kowalewski had inspected were signed by co-op students. The company proposed that it should file a representation petition wherein the question could be resolved. The union then made a counterproposal that the company recognize the union on the basis of a card check in a unit

excluding the students. The company agreed to consider this but indicated that its intention was to file a representation petition the next day. The union representative called back fifteen or twenty minutes later and stated that the union now definitely considered the co-op students a part of the unit and that any offer made by him which involved their exclusion was withdrawn.

The following day, November 8, the company filed a representation petition. The same day the company's employees went out on strike to protest the discharge of Ostrowski. The union filed unfair labor practice charges claiming Ostrowski's discharge violated §§ 8(a)(1) and (3). On November 17, a formal hearing was held on the election petition at which the union argued for inclusion of the co-op students in the bargaining unit. December 6 the Regional Director ruled that the appropriate unit did not include the students and an election was scheduled.

During the strike thirteen workers received letters informing them that they had been permanently replaced. On December 18, the strike ended and the union sent a telegram to petitioner on behalf of its employees offering their unconditional return to work. Colecraft subsequently offered to reinstate all of the workers who had struck with the exception of those who had received replacement letters and William Palumbo, who had told Norman Cole that he would advise the company of the results of his Armed Forces physical examination.

On December 20, after the strike but prior to the scheduled election, the union amended the unfair labor practice charges pending before the Board to allege a § 8(a)(5) violation in petitioner's refusal to recognize the union at the time of the November 5 demand. The Regional Director dismissed on his own motion the employer's election petition and issued the complaint in this action.

The Trial Examiner found that the co-op students should not be part of an appropriate bargaining unit and that the union represented a majority of workers

in an appropriate unit at the time of the recognition demand. He found that petitioner did not recognize the union in order to gain time "to subvert the Union's majority, to thwart unionization, and to avoid collective bargaining." Therefore he found that Colecraft violated § 8(a) (5) and recommended that the Board order Colecraft to bargain with the union, following the *Joy Silk Mills* doctrine. Joy Silk Mills, Inc., 85 NLRB 1263, enforced as modified, Joy Silk Mills v. N. L. R. B., 87 U.S.App.D.C. 360, 185 F.2d 732, cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1950).

The Examiner also found that Ostrowski's discharge violated §§ 8(a) (1) and (3) and that the discharge was the cause of the strike. Accordingly, he found that the refusal to reinstate strikers was a violation of § 8(a) (3) and recommended that the company be ordered to offer to reinstate the discharged workers and to give them back pay. He also found that various instances of employer conduct constituted § 8(a) (1) violations which rendered it impossible to hold a coercion-free election among the employees. The Board accepted the Trial Examiner's findings and adopted the recommended order with minor modifications not relevant here.

Because we find that there is not substantial evidence in the record as a whole to support the Board's findings that petitioner violated § 8(a) (5) of the Act by refusing to recognize and bargain with the union, that Ostrowski's discharge violated § 8(a) (3) and that the three incidents enumerated below violated § 8(a) (1), we remand to the Board to determine whether or not a bargaining order is justified by those unfair labor practices as to which we find there was substantial evidence, and we enforce the Board's order in all other respects.

### The § 8(a) (1) Charges

The Board found ten instances in which conduct of the management and supervisors of the company violated § 8(a) (1). In seven instances petitioner's contention that the violations are not supported by substantial evidence is without merit. The record clearly supports the Board and we think it unnecessary to restate all of the evidence upon which its findings were founded. However, there are three incidents in which we feel the Board's findings are not supported by substantial evidence.

First, on November 4 or 5, employee Joe Wozniak told another employee that a union was "really needed" at Colecraft. The Trial Examiner found that the employee said this with the intention that supervisor Stepnick hear it. Stepnick's reaction was, "Before you ever get a union in here, they'd close down the shop." In this first incident it is evident that the employee baited his supervisor in the hope of getting a violent anti-union response.

Second, on November 5, Stepnick was working with two employees. One asked the other why everything was so gloomy. The other answered, "You know why. There's too much freaking union talk around. Anyone involved will get fired." The first employee then looked at Stepnick who said, "That's it!" In the second incident, either the employees intended to bait the supervisor or they were seeking his opinion.

When employees intend to provoke expressions of anti-union views from their supervisors, we cannot believe that any anti-union views they express have the same deterrent or coercive effect as they do when unprovoked. In the absence of any showing that the supervisor's response actually had a coercive effect, the Board may not assume that the employees were threatened or coerced in violation of their § 7 rights. Similarly, when an employee seeks the opinion of a supervisor ostensibly to help the employee to decide whether or not to support the union, the supervisor's expression of his opinion to the employee is not a violation of § 8(a) (1). NLRB v. Great Atlantic & Pacific Tea Company, 346 F.2d 936, 941 (5 Cir. 1965).

The third incident occurred on November 5 when some employees overheard

a conversation between Stepnick and another supervisor. The evidence shows that this conversation was in progress when the employees happened upon the scene and as soon as the supervisors noticed that the employees were present they stopped talking.

■ While an employer may be charged under the Act with declarations of supervisory employees which would not be charged to him under the doctrine of respondeat superior, N. L. R. B. v. Moench Tanning Co., 121 F.2d 951, 953 (2 Cir. 1941), the employer is not to be charged with the private conversations of its supervisors. Prerequisite to charging an employer for the remarks of its supervisory employees is a finding that the workers would have just cause for believing that the supervisors were acting for or on behalf of their employer. Irving Air Chute Company v. N. L. R. B., 350 F.2d 176, 179 (2 Cir. 1965). It is clear from the record that the supervisors thought they were having a private discussion of the probable consequences of the union's organizing campaign which they did not intend to be overheard by other employees. Under these circumstances, the Board has failed to show that the employees who overheard the conversation viewed it other than as an exchange of views between the supervisors. There is nothing in the record from which the Board could infer that the workers had reason to believe the supervisors were acting for or on behalf of the employer. Although the same remarks made under different circumstances might constitute a § 8(a) (1) violation, the employer is not chargeable with an unfair labor practice on the record before us.

### The Discharge of Ostrowski and the Strike

On the same day that the union made its bargaining demand, Colecraft discharged Ostrowski for absenteeism and tardiness. The Board held that the discharge violated both §§ 8(a) (1) and (3).

■ Prior to November 5, 1965, the company had been very lenient with regard to deviations from its 53-hour "required" work week. No warnings or reprimands for absenteeism or tardiness had been given and there is no evidence of previous discharges on this ground. The Board's finding that the company changed its policy as a result of the bargaining demand and that the change in policy was designed to and had the effect of discouraging membership in the union in violation of § 8(a) (1) is fully supported by the record, especially in light of Cole's statement to the union representatives on the day Ostrowski was discharged. Therefore the Board's order requiring petitioner to offer Ostrowski reinstatement with back pay from the date of his discharge should be enforced.

■ However the Board has failed to adduce substantial evidence in support of its finding that § 8(a) (3) was violated. It found that the company did not retaliate against Ostrowski because of his union activities, but fired him as a result of his being late that morning in violation of established work rules. While the company, in violation of § 8(a) (1), changed the manner in which the work rules were enforced, there is no showing of discrimination against Ostrowski in his discharge. There cannot be a § 8(a) (3) violation without a showing that the employer's conduct was based upon knowledge of the employee's union sympathies or otherwise discriminated against him. Local 357, International Brotherhood of Teamsters, etc. v. N. L. R. B., 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1960); Radio Officers' Union, etc. v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954); N. L. R. B. v. Piezo Manufacturing Corp., 290 F.2d 455 (2 Cir. 1961); N. L. R. B. v. Redwing Carriers, Inc., 284 F.2d 397 (5 Cir. 1960). We therefore reverse the Board's finding that the discharge of Ostrowski violated § 8(a) (3).

■ Since Ostrowski's discharge violated § 8(a) (1) and it is clear that his discharge was the cause of the strike on November 8, the strike was an unfair labor practice strike and the strikers are

entitled to reinstatement upon an unconditional offer to return to work. Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956); N.L.R.B. v. Park Edge Sheridan Meats, Inc., 323 F.2d 956, 957, 959 (2 Cir. 1963); N. L. R. B. v. Sunrise Lumber & Trim Corp., 241 F.2d 620, 625 (2 Cir.), cert. denied, 355 U.S. 818, 78 S.Ct. 22, 2 L.Ed.2d 34 (1957).

■■■■■ December 17, 1965 the union sent petitioner a telegram offering "collectively and individually for all employees" unconditional return to work. The telegram stated, "each individual return to work will be regarded as a separate and individual matter." Petitioner contends that this offer was not unconditional, but impliedly conditioned upon rehiring everyone including Ostrowski. We do not so construe the language of the offer. Even if the telegram could be interpreted as petitioner contends, petitioner waived this objection by failing to expressly base the refusal to reinstate upon this ground when the employees appeared for work. N. L. R. B. v. Comfort, Inc., 365 F.2d 867, 877–878 (8 Cir. 1966).

■■■■■ Individual strikers who receive replacement letters are not required personally to report to work in order to protect their job rights. When the employer refused to rehire those strikers who reported who had received replacement letters, the employer's intent became clear and other employees who had received similar letters were excused from making personal appearances. "Where an employer has made clear his refusal to reinstate strikers each striker need not undertake the futile gesture of offering in person to return to work." N. L. R. B. v. Park Edge Sheridan Meats, Inc., supra 323 F.2d at 959. Since the strikers who received replacement letters were entitled to reinstatement after unconditionally offering to return to work even though they did not personally report to work, the Board's order requiring petitioner to reinstate them and awarding the strikers back pay from the time of their unconditional offer to return to the date of their reinstatement should be enforced.

■■■■■ Employee William Palumbo did not receive a replacement letter. When offered reinstatement he advised Norman Cole by telephone that he was about to take an Armed Forces pre-induction physical examination and he would advise the company of developments. After that examination he asked for reinstatement which was never granted. We find that under the circumstances William Palumbo's telephone conversation with Norman Cole was equivalent to a personal application for reinstatement and the Board's order that he be offered reinstatement with back pay should be enforced.

*The § 8(a) (5) Charge*

■■■■■ After the strike the union amended the unfair labor practice charges then pending to allege that petitioner's refusal to recognize the union on November 5 violated § 8(a) (5).[1] The Regional Director dismissed the election petition which had been filed by the company and issued a complaint.[2] The Board found that petitioner did not have a good faith doubt as to the union's majority in an appropriate unit,[3] and that

1. Colecraft's contention that the union waived its right to file a § 8(a) (5) charge of participating in the representation proceeding is without merit. Irving Air Chute Co. v. N. L. R. B., 350 F.2d 176, 182 (2 Cir. 1965).

2. There is no merit in petitioner's contention that the Board's dismissal of the election petition pending determination of the unfair labor practice charges is a denial of due process. Furr's Inc. v. N. L. R. B., 350 F.2d 84 (10 Cir. 1965).

3. The Regional Director's finding in the representation election proceedings, that the company's contention that the union sought recognition in an inappropriate unit was correct, did not decide the question whether or not the company committed an unfair labor practice by refusing to recognize the union. See Time Square Stores Corp., 79 NLRB 361 (1948). That question may only be decided in the context of an unfair labor practice proceeding. See Lawrence Ty-

petitioner had violated § 8(a) (5) and ordered the company to bargain with the union.

Petitioner contends that it is not required by the Act to recognize a union when it demands representation of workers in an inappropriately large unit, even when the union represents the majority of workers in an appropriate unit. National Can Corporation v. N. L. R. B., 374 F.2d 796, 801 (7 Cir. 1967). The Board rejected this view and contends that the addition of six co-op students to the fifty-two production and maintenance employees whom it found to be the appropriate unit was an "insubstantial variance" that did not mitigate the employer's duty to bargain. We do not agree.

All of the cases which the Board has cited in support of its application of the substantial variance test to this case are clearly distinguishable. The substantial variance test has been approved by the courts and, so far as we can determine from the Board's brief, has been applied by the Board only where the employer failed to ground its refusal to recognize the union upon the inappropriateness of the demanded unit, N. L. R. B. v. Fosdal, 367 F.2d 784 (7 Cir. 1966); Brewery and Beverage Drivers and Workers Local No. 67, etc. v. N. L. R. B., 103 U.S.App. D.C. 190, 257 F.2d 194 (1958); [4] United Butchers Abattoir, Inc., 123 NLRB 946 (1959),[5] where the unit requested by the union is ambiguous, United Butchers Abattoir, Inc., supra, or where the unit which the union requested was smaller than the unit which the employer believed to be appropriate and the union had a majority in both the requested and appropriate units. N. L. R. B. v. Fosdal, supra; N. L. R. B. v. Galloway Manufacturing Corp., 312 F.2d 322, 323 (5 Cir. 1963); [6] Brewery and Beverage Drivers and Workers Local No. 67, etc. v. N. L. R. B., supra; United Butchers Abattoir, Inc., supra. In this case the union demanded a unit which was larger than that which the employer considered appropriate and the employer told the union that the inappropriateness of the unit was the reason that it was refusing to grant recognition.[7] The Board also

pographical Union v. McCulloch, 121 U.S. App.D.C. 269, 349 F.2d 704, 708 (1965).

4. The Board had held that there was no § 8(a) (5) violation because the union had demanded recognition in a unit which the Board considered inappropriate. The court remanded the case to the Board, holding that the Board had acted arbitrarily in determining that the unit which neither the Board nor the company had challeged in two previous consent elections was inappropriate. The court's holding that there was only an insubstantial variance between the unit demanded and an appropriate unit was based upon the facts of the case, namely that all the employees did exactly the same work and the additional employees which the Board added to the unit were all trainees for the jobs previously included in the unit. The co-op students at Colecraft were part time employees rather than trainees and very few of them stayed on after completing school.

5. "The Respondent's objection as to the scope and composition of the unit, raised for the first time at the hearing, comes too late to convince us that its refusal was based on some bona fide doubt as to the appropriateness of the unit." 123 NLRB at 957.

6. The Board's order was enforced *per curiam* on the ground that the § 8(a) (1) and § 8(a) (3) violations permitted the Board to infer lack of good faith in the company's refusal to bargain, an inference which this court has declined to draw. N. L. R. B. v. River Togs, Inc., 382 F.2d 198 (2 Cir. July 27, 1967). The Board's decision in Galloway Mfg. Corp., 136 NLRB 405 (1962), indicates that the company objected to the requested unit because it was too small.

7. In Industrial Union of Marine and Shipbuilding Workers, etc. v. N. L. R. B., 320 F.2d 615 (3 Cir. 1963), cert. denied, Bethlehem Steel Co. v. N. L. R. B., 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964), the real issue was whether or not the employer could unilaterally change the terms and conditions of employment after the expiration of a collective bargaining agreement when the employer had violated its duty to bargain collectively prior to the expiration of the contract by insisting upon a proposal that was not a mandatory subject of bargaining. However the employer also

found the larger unit to be inappropriate.

 Even when the union has a majority in both the requested unit and the appropriate smaller unit, the Act forbids the employer to bargain in an inappropriately large unit.[8] Bargaining in an inappropriately large unit would interfere with the Section 7 rights of those employees who would not be included in an appropriate unit and do not wish to be represented by the union. The Act extends to each employee the right to refrain, as well as the right to participate, in collective bargaining. It is an unfair labor practice for an employer or a union to interfere with this right. See International Ladies' Garment Workers' Union v. N. L. R. B., 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961); N. L. R. B. v. Flomatic Corporation, 347 F.2d 74, 78 (2 Cir. 1965).

If we were to uphold the Board's contention that petitioner violated § 8(a) (5), employers would unjustifiably be placed on the horns of a dilemma. If an employer refused to bargain in the demanded unit, the Board would find that he committed a § 8(a) (5) violation and issue a bargaining order. On the other hand, if an employer agreed to bargain with the union in the inappropriately large unit, the employer could be charged with violating § 8(a) (1) by impairing the Section 7 rights of the employees improperly included in the unit who did not wish to be represented by the union. In either case, the employer would be forced to recognize the union on the strength of a card showing rather than through the more reliable representation election procedure.

By demanding an overly large unit, a union would be able to circumvent the Board's policy of permitting an employer to refuse to recognize a union when the employer has a good faith doubt as to the union's majority status in an appropriate unit after being shown signed authorization cards. E. g., Orkin Exterminating Co. of Kansas, Inc., 136 NLRB 630 (1962); John P. Serpa, Inc., 155 NLRB 99 (1965), reversed and remanded sub nom. Retail Clerks Union Local 1179 etc. v. N. L. R. B., 376 F.2d 186, 103 U.S.App. D.C. (9 Cir. 1967). See Lesnick, Establishment of Bargaining Rights Without an NLRB Election, 65 Mich.L.Rev. 851 (1967). Sustaining the Board's position could have the unfortunate effect of inducing unions to ask for inappropriately large units in which the unions have been able to achieve card majorities, in order to avoid the dangers that the union might lose a representation election. Permitting employers to refuse union requests for recognition in inappropriately large units will tend to encourage negotiation over unit size instead of the "take it or leave it" attitude which characterized the union recognition demand in this case. Section 7 rights of all employees are protected because the union can achieve recognition at any time simply by making a new recognition demand in an appropriate unit. Then if the employer re-

---

urged that it was relieved of the obligation to bargain because the union demands covered an inappropriate unit. Both the court and the Board treated this as "more an apparent than a real issue in this case" because the employer conceded that the union represented a majority in both units and this was not a card recognition case, but rather a case concerning proper subjects of bargaining between a recognized union and the employer. Moreover, the Board found that the employer was not guilty of subjective bad faith in its course of conduct and only violated § 8(a) (5) by insisting upon a clause concerning a non-mandatory subject and depriving union representatives of seniority and abandoning the grievance procedure when the union contract expired. Therefore the question of whether the employer can refuse to recognize a union when it demands an inappropriately large unit was not before the court.

8. Of course, if the Board should find that an employer was incorrect and that the unit which a union demands is an appropriate unit, then the Board may order the employer to bargain with the union, if the Board finds that the refusal to bargain was not made upon other grounds sufficient to support a good faith doubt. United Aircraft Corp. (Hamilton Standard Div.) v. N. L. R. B., 333 F.2d 819 (2d Cir. 1964).

fused to bargain without a good faith doubt of the union's majority status the Board could properly find a § 8(a) (5) violation and might order the employer to bargain with the union.

 Moreover, the Board's finding that petitioner refused to bargain with the union in order to gain time to subvert the union's majority, thwart unionization and avoid collective bargaining is not supported by substantial evidence on the record as a whole. The company was willing to discuss the possibility of recognition of the union and agreed to consider recognition of the union without an election in an appropriate bargaining unit. However, the union withdrew its offer to bargain in the appropriate unit before the employer had a reasonble time in which to act. Further, it was the employer rather than the union which filed for the representation election. Not only did the employer indicate a willingness to consider a recognition of the union in an appropriate unit, but it suggested the use of the election procedure as an amicable method of settling its dispute with the union as to the size of an appropriate unit.

 While the Board has found § 8(a) (1) violations which show that the employer desired to thwart unionization through coercive activity, it has not shown that the company would have refused to bargain with the union if it had not withdrawn its bargaining request for an appropriate unit. See N. L. R. B. v. River Togs, Inc., supra. Indeed the petitioner did everything that it could within the framework of the Act to assure that if a union majority existed in an appropriate unit, the union's claim would be substantiated and the union would be accorded recognition. For these reasons we reverse the Board's finding that petitioner violated § 8(a) (5).

 In view of the generally recognized unreliability of authorization cards as an index of employee support for a union,[9] we think it best carefully to scrutinize any Board decision which would approve a substitution of authorization cards for the more reliable representation election procedure. This court has noted with approval the trend toward use of the bargaining remedy only when the employer's unfair labor practices have destroyed the atmosphere necessary for a fair representation election. N. L. R. B. v. River Togs, Inc., supra. When the union's actions have placed the employer in a position where it must refuse to bargain in order to protect the Section 7 rights of its employees and maintain the integrity of the bargaining unit, and then the union files unfair labor practice charges in order to stop a scheduled representation election, we think the Board must show that the employer's unfair practices are sufficiently serious and pervasive to require a bargaining order instead of an election. N. L. R. B. v. Flomatic Corp., supra. When the union makes representation demands only in an inappropriate unit, the Board may not issue a bargaining order merely because it finds that the union had a majority in an appropriate unit. In such a case, the employer has not refused to bargain with the union in an appropriate unit.

 A bargaining order, like any other Board order, must be supported by a finding of an unfair labor practice. 29 U.S.C. § 160(c). Because the Board based its bargaining order in this case upon the erroneous finding of a § 8(a) (5) violation and the existence of more § 8(a) (1) violations than we have found to be supported by substantial evidence, we remand the case to the Board so that it may determine whether or not the remaining § 8(a) (1) violations were sufficiently serious to prevent holding a proper election and justify issuing a bargaining order.

FEINBERG, Circuit Judge (concurring in part and dissenting in part):

Although I concur in most of the result here, I do not agree with a part of the

9. Sunbeam Corp., 99 NLRB 546, 550–51 (1952). See N. L. R. B. v. River Togs, Inc., supra at n. 10; N. L. R. B. v. Flomatic Corp., supra 347 F.2d at 78.

section 8(a) (5) discussion and dissent from a portion of the section 8(a) (1) holding.

1. As I understand the majority opinion, there can never be a refusal to bargain by an employer under section 8 (a) (5) if the union's request for recognition is for too large a unit—even if only by one employee. Neither precedent nor policy justifies such a broad rule. Of course, under section 8(a) (5), if there is no proper demand for bargaining, there can be no refusal to bargain. To deal with the case in which there is a dispute about the proper unit, the board has evolved the "insubstantial variance" test. If the "variance" between the unit requested and the unit ultimately determined to be appropriate is "substantial," the request to bargain is inoperative. On the other hand, if the variance is insubstantial, the request has legal effect. This seems to me to be a sensible result, a view shared by other courts. E. g., N. L. R. B. v. Fosdal, 367 F.2d 784 (7th Cir. 1966); Brewery & Beverage Drivers Workers Local 67, etc. v. N. L. R. B., 103 U.S.App.D.C. 190, 257 F.2d 194 (1958); cf. Industrial Union of Marine & Shipbuilding Workers, etc. v. N. L. R. B., 320 F.2d 615 (3d Cir. 1963), cert. denied sub nom. Bethlehem Steel Co. v. N. L. R. B., 375 U.S. 984, 84 S.Ct. 516 (1964). The majority apparently agrees with this if the insubstantial difference is on the low side, i. e., so long as the union seeks to represent too few employees. But if the union claims too many, even though by an "insubstantial" number, the result is different. In that case, according to the majority, there can be no refusal to bargain by the employer.

The first reason given to justify this result is that:

Bargaining in an inappropriately large unit would interfere with the Section 7 rights of those employees who would not be included in an appropriate unit and do not wish to be represented by the union.

There are two answers to this. First, section 7 rights of those employees who do wish the union to represent them are also involved when a refusal to bargain charge is thrown out because the union claimed to represent too many employees. Under the majority's view, if the union claims a unit of 100 employees, although the proper unit is only 99, the section 7 rights of the 99 would not be enforced, even when all 99 want the union to represent them. Therefore, under the majority's rule, section 7 rights would also be impaired. Second, I agree that bargaining should not be had "in an inappropriately large unit." However, the Board did not order bargaining here in an inappropriately large unit; the unit was in fact reduced by the Board. The response to this, I suppose, is another basis of the majority's opinion, the assertion that:

Sustaining the Board's position could have the unfortunate effect of inducing unions to ask for inappropriately large units in which the unions have been able to achieve card majorities, in order to avoid the danger that the union might lose a representation election.

This may be so, but I do not agree that the "effect" would be significant. So long as the "insubstantial variance" test is used, the Board and the courts have a conceptual tool for keeping inappropriateness of a demanded unit at a minimum. On the other hand, throwing out the "insubstantial variance" test may require ignoring the section 7 rights of many employees because the union overreached as to one.

The real issue in this case is whether there was substantial evidence for the Board's finding that petitioner refused to bargain in order "to gain time to subvert the union's majority, thwart unionization and avoid collective bargaining." For the reasons admirably stated in the majority opinion at 1008, I agree that there was not. Since this is a sufficient basis for not enforcing an order to bargain now, I concur in that decision. But I would not announce a broad rule that may plague us when an employer's bad faith in refusing to bargain is ob-

vious, but he is immune because the union claimed to represent one employee too many.

2. As to the section 8(a) (1) holding, I would not reverse the Board's findings as to the first two incidents discussed in the majority opinion. I dissent from the proposition that an otherwise proper inference of coercive effect from language used by a supervisor cannot be made "When an employee seeks the opinion of a supervisor." I do not agree that in that instance there must be some *other* "evidence of the effect on the employees to support a finding of threats or coercion * * *." If an employee asks a supervisor what will happen if he joins the union and the supervisor says, "You will be fired," the Board may find that coercive. I say "may," not "must," because perhaps the employee was not coerced; one of the factors to be considered is that the employee did ask the supervisor. But I do not agree with the flat rule that the Board may not find the statement coercive without other evidence simply because the employee initiated the inquiry.