**P. R. MALLORY & CO., Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 17554.

United States Court of Appeals, Seventh Circuit.

Jan. 23, 1970.

As Modified on Rehearing and Rehearing En Banc Denied April 3, 1970.

Frederic D. Anderson, Charles E. Bruess, Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Angelo v. Arcadipane, Atty., N.L.R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Paul J. Spielberg, Attys., N. L. R. B., for respondent.

Before DUFFY, Senior Circuit Judge, and KILEY and CUMMINGS, Circuit Judges.

KILEY, Circuit Judge.

The National Labor Relations Board found petitioner P. R. Mallory & Co., Inc. guilty of violating Sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act.[1] Mallory seeks to review and set aside the Board's order, and the Board applies for enforcement.

---

1. 29 U.S.C. § 151 *et seq.*

Mallory manufactures capacitators, electronic devices that store electrical energy and are used principally in air conditioners and compressors. It has plants at Huntsville, Alabama; Glasgow, Kentucky; and Crawfordsville and Greencastle, Indiana. It also makes "plate" at Indianapolis, where Dibble, its Works Manager of all the plants, has his office.

In August, 1966, the United Mine Workers Union began an organization drive at the Greencastle plant. In May, 1967, the drive began at the Crawfordsville plant. The alleged violations arose during the periods of these drives.

The General Counsel alleged violations of Section 8(a) (1) by threats, promises of benefits, interrogation and solicitation of Sarah Witty to engage in surveillance of co-employees; and of Sections 8(a) (1) and 8(a) (3) in discharging Hubble and Otis Witty and three other employees not involved here. The Examiner concluded that these violations had been established. He recommended, *inter alia,* a cease and desist order against the unlawful practices; and that Mallory be required to offer employees Hubble and Witty "immediate and full reinstatement" and to pay them for wages lost as a result of the discriminatory discharges. The Decision and Order of the Board adopted the Examiner's findings, conclusions and recommendations, and the petition before us followed.

## SECTION 8(a) (1) VIOLATIONS

■ The Board found that Mallory violated 8(a) (1) in soliciting aid in union activity surveillance from Sarah Witty. We consider the record too thin to give substantial support to that finding. During August, at the Greencastle plant, she was asked, when she went out on the floor, to "keep [her] ears open * * * see what [she] could find out about the union." There is no further evidence on this point. Mallory's request to her may bear on the question of union animus, but the record is not sufficient for a finding of a separate violation.

■ The Examiner found that employee "group leader" Hartman, at Greencastle, threatened discharge for anyone talking about the union in the plant. Hartman testified he was told to watch for anyone passing union cards. It was not refuted that both Otis Witty and Hubble, when hired, were told that Mallory did not want its plants organized. Mallory's counsel conceded that was the Company policy. We think there is substantial support in the record as a whole for concluding that the violation of Section 8(a) (1) occurred.[2] This court's decision in National Can Corp. v. NLRB, 374 F.2d 796 (7th Cir. 1967), does not compel a different conclusion. There is more here than an exchange of views between a low-level supervisor and one employee, and there are no employer letters to, and conversations with, employees giving assurances of freedom in union activity—which the record there showed.

## SECTION 8(a) (3) VIOLATIONS

The complaint alleged that Mallory unlawfully discharged Hubble, Gray, Otis Witty, Michael and Chiles. The Board found a Section 8(a) (3) violation only with respect to Hubble and Witty. The charges against the other three employees were dismissed.

■ Otis Witty, father-in-law of Sarah Witty, was hired at the Greencastle plant in March, 1966. He was a production employee engaged in work on tantalum capacitators (TAS), specifically dipping and baking "heads,"[3] two of the steps in an elaborate manufacturing process. The heads are subjected to tests for their capacity to store electric energy and for leakage. If the products fail the

2. The Examiner decided, however, that the General Counsel failed to prove other alleged threats or unlawful promises of fringe benefits or wage increases.

3. Minute anodes made of compressed tantalum powder are treated, and have parts welded to them to comprise a capacitator. Once the voltage is checked, capacitators are welded onto a series of parallel rods and set into an 8½" x 8½" frame known as a head.

tests, they are either scrapped, or returned for repeated processing if the failure is not serious.

Witty attended several union meetings beginning September 29. On October 5 he was reprimanded for the first time for producing an allegedly defective head of TAS anodes. He reacted with a vulgar comment. A day or two later he was transferred to production of TIMS, a much smaller capacitator requiring greater visual acuity. On October 14 he was reprimanded for excessive scrap, and on October 21 he was reprimanded a third time. His reprimands for poor workmanship in a sense paralleled his union activities. On October 24 he was elected president of the union organization at Greencastle. The next day he was discharged.

The Board found Witty was discharged for his union activity and that the reason asserted by Mallory that the discharge was for excessive scrap was "pretextual." We think there is a substantial basis in the record as a whole to support the Board's finding of an 8(a) (3) violation.

Witty had done satisfactory work on the TAS line for six months, but was transferred to the more difficult TIMS a couple of days after the first reprimand and his vulgar response. His two supervisors, admitting his good work generally on TAS and his seniority over another TAS worker, had him discharged instead of recognizing his seniority and "bumping" the TAS employee junior to him in seniority. The reasons given were his "past record"—which was good generally —and his "attitude" reflected by his October 5 vulgar response—which in context could scarcely be a reason for two shop supervisors to disregard his seniority.

In support of the main reason given for Witty's discharge, i. e., his "scrap rate," Mallory introduced scrap records. The direct examination of Mallory's witnesses who related the records to Witty made a persuasive showing of a bad scrap record.

On cross-examination, however, the testimony of these witnesses and especially of foreman Steele provided a basis upon which the Examiner could find that there was a purposeful focus on Witty's performance: After a good performance for six months in the TAS category, Witty was reprimanded and transferred a few days later to the more difficult work on TIMS. The following week he was again reprimanded about a "large increase" in scrap. The next weeks's reprimand was because fifty per cent of his products on certain days required stripping and rework. Steele said no one had a worse record than Otis Witty. However, the "large increase" in scrap at the time was the fault of all nine TIMS workers, not of Witty alone. The records show that none of the work processed solely by Witty had to be reprocessed on those certain days. In any case, reprocessing did not mean scrapping. The records for those days of other TIMS co-workers on three shifts were not checked for comparison. The scrap reports were issued daily and the only ones studied by Steele were the bad reports. Despite Witty's six months good record in TAS and his seniority over a TAS worker, he could not be retained on the TAS products because of "his past records."

On February 6, 1967, Hubble was hired and assigned to the impregnation room.[4] After three months he was promoted to the stockroom, and worked there with Carmichael, Bishop, and Cunningham. He was next in seniority to Carmichael. Bishop was laid off March 12 and Cunningham gave notice of resignation as of March 19. Upon receiving that notice Bishop was recalled to fill in for Cunningham. On Friday, March 19, his supervisor asked Hubble if he would work Saturday because the stockroom was shorthanded. Friday afternoon Dibble called plant manager Marquis. As a result of the call, Hubble was fired. Later three foremen from the Kentucky

---

4. This was where the products were vacuumed and impregnated with oil.

and Indianapolis plants were transferred to the Crawfordsville plant stockroom.

Mallory contends that Dibble made a sound business judgment in laying off Hubble. Its argument goes that poor business with declining orders resulted in a decrease of twenty-five per cent in production and non-production employees when Hubble was laid off; that it was good judgment to transfer the three foremen on the Kentucky and Indianapolis men to Crawfordsville in order to retain them against an upturn in business, rather than to keep Hubble, an employee of only three months; and that keeping the foremen on the Kentucky and Indianapolis plant payrolls was good cost accounting and cost control practice.

Dibble testified that he told Marquis to lay off "one" non-production man, did not tell him who to lay off, and further stated that when he gave the order he did not know Cunningham, a non-production worker, had quit that day. But Hubble's foreman and Marquis surely would have known something about the bad business "marketing forecast" when Bishop was recalled to take Cunningham's place, and when Hubble was asked to work on Saturday because the stockroom was short-handed. Although Dibble says he ordered the layoff of "one man," about a "week or so" later he told Marquis to transfer—for the first time in Mallory history—three foremen from the Kentucky and Indianapolis plants for stockroom work. Dibble's testimony concerning these apparent inconsistencies is too vague for us to say it should have been accepted as credible. We think, in light of the proven anti-union animus, the record as a whole supports the decision of the Board that Hubble was discharged for his union activities; the finding of an 8(a)(3) violation was justified.[5]

We hold that the Board's order should be enforced except as to the alleged 8(a)

(1) violation by solicitation of surveillance; that part is set aside.

Petition granted in part; order enforced in part.

---

5. We have disregarded a footnote in the Board's brief referring to "the latest in a series of unfair labor practice cases involving various Mallory plants." See Brief for Respondent at 2 n. 2. We accordingly deny Mallory's motion in this court to require the Board to file here the record in case No. 9–R C–6736.